# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Triple 7 Illinois, LLC v. Gaming & Entertainment Management-Illinois, LLC,*
**2013 IL App (3d) 120860**

| | |
|---|---|
| Appellate Court Caption | TRIPLE 7 ILLINOIS, LLC, an Illinois Limited Liability Company, Plaintiff-Appellant, v. GAMING AND ENTERTAINMENT MANAGEMENT-ILLINOIS, LLC, an Illinois Limited Liability Company, Defendant-Appellee. |
| District & No. | Third District<br>Docket No. 3-12-0860 |
| Filed | July 26, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action seeking to declare an exclusive placement agreement between a restaurant and a video gaming terminal operating business invalid under the Video Gaming Act, the trial court properly dismissed the action on the ground that the agreement did not violate the Act or the associated regulations. |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 12-MR-165; the Hon. R.J. Lannon, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Robert M. Riffle (argued) and Lane G. Alster, both of Elias, Meginnes, Riffle & Seghetti, P.C., of Peoria, for appellant.

Douglas R. Ramsey (argued) and Kimberly R. Walberg, both of Shefsky & Froelich Ltd., of Chicago, and Thomas J. Arkell, of Dunn Law Firm LLP, of Bloomington, for appellee.

Panel

JUSTICE LYTTON delivered the judgment of the court, with opinion. Justices Carter and O'Brien concurred in the judgment and opinion.

## OPINION

¶ 1 Plaintiff Triple 7 Illinois appeals from the trial court's dismissal of its declaratory judgment action, seeking to declare defendant Gaming & Entertainment Management-Illinois's (GEM) exclusive placement agreement with Da Lee's Fine Dining invalid under the Video Gaming Act (Act) (230 ILCS 40/1 *et seq.* (West 2010)). We affirm.

¶ 2 In June 2010, Lee Sember, the owner of Da Lee's, signed an "Exclusive Placement Agreement" (Da Lee's Agreement) with Metro Amusements, Inc., a video gaming terminal operating business. Under the agreement, Sember granted Metro the exclusive right to place video gaming terminals in his restaurant for a period of 10 years following installation and operation of the first terminal in accordance with the Act. The miscellaneous provision at the end of the contract provided:

"This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representative, successors and permitted assigns. Prior to Terminal Operator being licensed as a 'terminal operator' pursuant to the Video Gaming Law [Video Gaming Act], Terminal Operator may freely assign and/or transfer this Agreement and its rights and/or obligations hereunder, subject to the Video Gaming Law [Video Gaming Act]. After Terminal Operator becomes a licensed terminal operator, Terminal Operator may not assign and/or transfer this Agreement and its rights and/or obligations hereunder except: (i) to another licensed terminal operator, or (ii) as may be permitted by the Video Gaming Law [Video Gaming Act]."

When the parties signed the Da Lee's Agreement, Metro was not a licensed terminal operator under the Act.

¶ 3 On September 2, 2010, Metro and Best Gaming, LLC, entered an asset purchase agreement in which Best acquired the business and operations of Metro and most of its assets and properties, including the Da Lee's Agreement. At the time Best acquired Metro's assets, Best's application for licensure as a video gaming terminal operator had not been granted.

¶ 4 On July 2, 2012, the Illinois Gaming Board issued a notice that it was denying Best's

application for a terminal operator's license. Best immediately filed a request for hearing to contest the denial. On July 17, 2012, Best assigned the Da Lee's Agreement to GEM, a licensed terminal operator under the Act. On July 19, 2012, the Board denied Best's request for a hearing.

¶ 5 On July 26, 2012, Sember was approached by a representative from Triple 7, another licensed terminal operator, and asked to sign an agreement for the exclusive placement of video gaming terminals in Da Lee's upon becoming a licensed establishment.[1] Sember agreed and signed a second exclusive placement agreement with Triple 7.

¶ 6 Shortly thereafter, GEM sent a letter to Triple 7 informing it that GEM had purchased all of Best's use agreements. In the correspondence, GEM claimed that the assigned agreements had been "vetted and approved" by the Gaming Board and requested that Triple 7 refrain from contacting establishments that had prelicensure agreements with Best.

¶ 7 Triple 7 filed a complaint for declaratory relief against GEM, seeking a judgment that the assigned Da Lee's Agreement was invalid under the Act and requesting an injunction to prevent GEM from attempting to enforce the agreement.

¶ 8 GEM filed a motion to dismiss, and the trial court granted the motion. In its written order, the court concluded that the agreement between Da Lee's and Metro was not a use agreement and therefore did not violate the Act or the video gaming regulations.

¶ 9 I

¶ 10 In 2009, the Illinois legislature passed the Video Gaming Act. The Act legalizes the use of video gambling terminals in Illinois, subject to regulation by the Gaming Board. 230 ILCS 40/1 *et seq.* (West 2012). Under the Act, certain restaurants, referred to as "licensed establishment[s]," can become licensed to allow terminals to be placed and operated in their businesses. 230 ILCS 40/5 (West 2012). The licensed individual or company that owns and maintains the video gaming terminals for placement in these licensed establishments is referred to as a "terminal operator." *Id.*

¶ 11 Section 5 of the Act defines a "terminal operator" as "an individual, partnership, corporation, or limited liability company that is licensed under this Act and that owns, services, and maintains video gaming terminals for placement in licensed establishments, licensed truck stop establishments, licensed fraternal establishments, or licensed veterans establishments." 230 ILCS 40/5 (West 2012). Section 25 states that a terminal operator may not maintain or place a video gaming terminal unless he has a valid video terminal operator's license issued in accordance with the Act. 230 ILCS 40/25(c) (West 2012). In addition, section 25(e) provides that no video gaming terminal may be placed in a licensed establishment "unless the owner or agent of the owner of the licensed establishment *** has entered into a written use agreement with the terminal operator for placement of the terminals." 230 ILCS 40/25(e) (West 2012).

---

[1]When the parties' filed their briefs on appeal, Da Lee's application for licensure remained pending before the Gaming Board. Da Lee's application was accepted on March 20, 2013.

¶ 12        The Gaming Board also adopted rules and regulations to administer the Act. See 11 Ill. Adm. Code 1800.110 *et seq.* (2013). Section 1800.110 of title 11 of the Administrative Code defines a use agreement as a "contractual agreement between a licensed terminal operator and a licensed video gaming location establishing terms and conditions for placement and operation of video gaming terminals by the licensed terminal operator within the premises of the licensed video gaming location." 11 Ill. Adm. Code 1800.110 (2013). Section 1800.320 further states:

> "In addition to the requirements set forth in the Act, a Use Agreement must satisfy the following:
>
> a) Only between a licensed terminal operator and a licensed establishment, licensed truck stop establishment, licensed veterans establishment or licensed fraternal establishment;
>
> * * *
>
> d) Prohibit any assignment other than from a licensed terminal operator to another licensed terminal operator;
>
> e) Contain a provision that releases the video gaming location from any continuing contractual obligation to the terminal operator in the event that the terminal operator has its license revoked or surrenders its license." 11 Ill. Adm. Code 1800.320 (2013).

¶ 13                                        II

¶ 14                                        A

¶ 15        Triple 7 argues that the Da Lee's Agreement assigned to GEM is invalid because it violates sections 1800.110 and 1800.320 of title 11 of the Administrative Code, which prohibit any assignment of use agreements other than from a licensed terminal operator to another licensed terminal operator.

¶ 16        As in all cases of statutory construction, our goal is to ascertain and give effect to the intent of the legislature, and the language of the statute is the best indication of that intent. *People ex rel. Birkett v. Dockery*, 235 Ill. 2d 73 (2009). "Where the statutory language is clear and unambiguous, we must give it effect without resort to other tools of interpretation." *Id.* at 79. Courts should not rewrite a statute or depart from its plain language by reading into it exceptions, limitations or conditions not expressed by the legislature. *In re Michelle J.*, 209 Ill. 2d 428 (2004).

¶ 17        A plain reading of section 1800.110 demonstrates that the Act only applies to "use agreements" as that term is defined by the Administrative Code. 11 Ill. Adm. Code 1800.110 (2013); 230 ILCS 40/5 (West 2012). The Administrative Code defines a use agreement as a "contractual agreement between a *licensed terminal operator* and a *licensed video gaming location* establishing terms and conditions for placement and operation of video gaming terminals by the licensed terminal operator within the premises of the licensed video gaming location." (Emphases added.) 11 Ill. Adm. Code 1800.110 (2013). The plain language indicates that a contract between two parties is not a use agreement under the Act unless it

is between a "licensed" operator and a "licensed" establishment. Here, neither Metro nor Da Lee's was licensed under the Act when it signed the placement agreement. Thus, the Da Lee's Agreement is not a use agreement. Therefore, the rules and regulations prohibiting the assignment of a use agreement do not apply to the agreement assigned to GEM.

¶ 18                                                           B

¶ 19        Triple 7 also argues that the agreement is invalid because sections 1800.110 and 1800.320 prohibit prelicensure agreements. Triple 7 interprets sections 1800.110 and 1800.320 to mean that only licensed terminal operators can enter into agreements for the placement and operation of video gaming terminals.

¶ 20        Triple 7's construction is problematic in several respects. First, it requires us to ignore the language used by the Gaming Board in the terminal operator license application. In section 8 of the application, the Gaming Board asks the applicant to list all businesses with which the applicant has entered into an agreement for the placement of terminals upon licensure and requests that the applicant submit copies of executed agreements, as well as any form agreements that the applicant used. This regulatory language anticipates that a terminal operator may have entered into placement agreements prior to its approval as a licensed operator under the Act.

¶ 21        Second, Triple 7 can point to no place in the Act or the regulations where such a limitation exits. Although the legislature has the ability to impose limitations on prelicensure contracts, the legislature did not do so. Nothing in the Act or the regulations prohibits the prelicensure placement agreement entered into by Da Lee's and Metro. See *Michelle J.*, 209 Ill. 2d at 437 (we cannot rewrite a statute and depart from its plain language by reading into it limitations or conditions not expressed by the legislature).

¶ 22        Third, interpreting the regulations to apply to agreements between nonlicensed entities would violate the right of private parties to freely contract. See U.S. Const., art. I, § 10; Ill. Const. 1970, art. I, § 16 ("No *** law impairing the obligation of contracts *** shall be passed."); *Braye v. Archer-Daniels-Midland Co.*, 175 Ill. 2d 201 (1997) (laws and public policy of the state permit and require freedom of contracting between competent parties).

¶ 23        Here, Metro and Da Lee's entered into an agreement that imposed certain rights and obligations in the event both parties were successfully licensed under the Act. The agreement is not invalid; it simply cannot be enforced under the Act until the parties' applications are approved by the Gaming Board. Once the parties are licensed, the terms of the agreement can be fulfilled under the Act and the agreement cannot be assigned. As the terms of the Da Lee's Agreement state, after a terminal operator becomes a licensed terminal operator, he may not assign the agreement except to another licensed terminal operator. However, until the terminal operator becomes licensed under the Act, the agreement may be assigned to another terminal operator.

¶ 24                                                          III

¶ 25        Triple 7 claims that even if the Da Lee's agreement is not a use agreement, we should

declare the agreement invalid based on the general premise that a contract for the unlicensed performance of an act is void. In support, Triple 7 cites *Timmerman v. Grain Exchange, LLC*, 394 Ill. App. 3d 189 (2009).

¶ 26　　In *Timmerman*, a grain company entered into several contracts with the plaintiff farmers to store and sell grain to a third party. Prior to the date set for delivery, the company lost its commodities license. Shortly thereafter, it assigned the plaintiffs' contracts to another grain dealer. By that time, grain prices had risen, making the contracts less favorable to the plaintiffs.

¶ 27　　On appeal, the court found that the contracts the grain company entered into guaranteed that it was licensed to deal and store grain. The court concluded that when the grain company surrendered its license, it became unable to perform its contracts and effectively repudiated them; thus the contracts and assignments of those contracts were unenforceable. *Timmerman*, 394 Ill. App. 3d at 202-03. Notably, the *Timmerman* court stated:

> "Had [the grain dealer] assigned the contracts prior to its loss of license–that is, prior to the happening of an act which effectively repudiated the contract–the plaintiffs might have been bound by the assignments. However, once [the grain dealer] lost its license to deal in grain, the contracts were effectively repudiated, the plaintiffs were no longer bound thereby, and no assignment of the contracts could bind the plaintiffs." *Timmerman*, 394 Ill. App. 3d at 201-02.

¶ 28　　The facts in this case are distinguishable. Unlike the assigned contracts in *Timmerman*, the assignment to GEM occurred while Best was an applicant and before the denial of its license was final. Moreover, the Da Lee's Agreement provides that the parties are bound by its terms on the date the first video gaming terminal is installed. A terminal operator may not install, maintain or operate a video gaming terminal until the terminal operator is licensed under the Act. Thus, the Da Lee's Agreement does not require the unlicensed performance of an activity, and we decline to apply the holding in *Timmerman*.

¶ 29　　　　　　　　　　　　　　　　　IV

¶ 30　　Last, Triple 7 argues that based on the provisions of section 1800.320 of title 11, the Gaming Board's denial of Best's licensure application immediately invalidated the placement agreement and released Da Lee's from any contractual obligation arising out of it. We disagree.

¶ 31　　Section 1800.320 of the regulations states that an agreement must contain a provision that releases the video gaming location from any continuing contractual obligation to the terminal operator in the event that the terminal operator has its license revoked or surrenders its license. 11 Ill. Adm. Code 1800.110 (2013). Here, the denial of Best's application became final on July 19, 2012, when the Gaming Board denied Best's request for a hearing. See 11 Ill. Adm. Code 1800.615(g) (2013) (if a request for hearing is filed with the Gaming Board, the denial of licensure becomes a final order on the date the board denies the request for hearing). Two days before the board's denial of a hearing, Best assigned the agreement to GEM. Until the denial of the request for a hearing, Best continued to be an applicant under the Act. See 11 Ill. Adm. Code 1800.695 (2013) (an applicant who has been denied a license

and requests a hearing shall be considered an applicant). Accordingly, at the time GEM purchased Best's assets, the Da Lee's Agreement had not terminated pursuant to section 1800.320, and Best had the contractual right to assign it.

¶ 32                                    CONCLUSION
¶ 33          The judgment of the circuit court of La Salle County is affirmed.

¶ 34          Affirmed.