# Illinois Official Reports

## Appellate Court

---

### *Semb's, Inc. v. Gaming & Entertainment Management-Illinois, LLC*,
### 2014 IL App (3d) 130111

---

| | |
|---|---|
| Appellate Court Caption | SEMB'S, INC., an Illinois Corporation, d/b/a Da Lee's Fine Dining, Plaintiff-Appellant, v. GAMING AND ENTERTAINMENT MANAGEMENT-ILLINOIS, LLC, an Illinois Limited Liability Company, METRO AMUSEMENTS, INC., an Illinois Corporation, and BEST GAMING, LLC, an Illinois Limited Liability Company, Defendants-Appellees. |
| District & No. | Third District<br>Docket No. 3-13-0111 |
| Filed | June 23, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the dismissal of plaintiff's complaint based on a contract for defendant's placement of video gaming terminals in plaintiff's establishment and allegations that the contract was an illegal contract for gambling, that neither party was licensed and that the contract was assigned both to and from unlicensed video gambling terminal operators on "use agreements" in violation of the regulations, the appellate court affirmed the dismissal based on the *res judicata* effect of the decision of the same district of the Illinois Appellate Court in *Triple 7*, which held that the agreements used were not "use contracts" and that the agreements did not violate any video gaming regulations. |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 12-MR-223; the Hon. Joseph P. Hettel, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Robert M. Riffle, of Morton, and Lane G. Alster (argued), of Elias, Meginnes, Riffle & Seghetti, P.C., of Peoria, for appellant.

Douglas M. Ramsey (argued) and Kimberly R. Walberg, both of Taft Stettinius & Hollister LLP, of Chicago, for appellee.

Panel

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice O'Brien concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

## OPINION

¶ 1    The plaintiff, Semb's, Inc., d/b/a Da Lee's Fine Dining (Da Lee's), filed a complaint against the defendants, Gaming & Entertainment Management-Illinois, LLC (GEM), Metro Amusements, Inc. (Metro), and Best Gaming, LLC (Best), regarding a contract for the placement of video gaming terminals (VGTs). The contract was originally between Da Lee's and Metro, which assigned the contract to Best, which then assigned it to GEM. The complaint alleged that the contract was invalid. The circuit court dismissed the complaint and Da Lee's appealed. On appeal, Da Lee's argues that the court's decision was erroneous because the contract was invalid and unenforceable in that it: (1) was an illegal contract for gambling; (2) was not between a licensed VGT operator and a licensed establishment, as required by regulations on "use agreements"; (3) was assigned both to and from unlicensed VGT operators, in violation of the regulations on "use agreements"; and (4) was immediately invalidated by the Illinois Gaming Board (the Board) denying Best's licensure application. We affirm.

¶ 2                                          FACTS

¶ 3    On June 14, 2010, Lee Sember, the owner of Da Lee's, entered into a contract with Metro (the Metro Agreement), which gave Metro the exclusive right to place VGTs in Da Lee's. Metro was a VGT-operating business, but it was not licensed in Illinois under the Video Gaming Act (Act) (230 ILCS 40/1 *et seq.* (West 2010)). Da Lee's was not a licensed video gaming location under the Act.

¶ 4    On September 2, 2010, Best acquired Metro and most of its assets, including the Metro Agreement. Best was also an unlicensed VGT-operating business. Best had previously applied for a license with the Board and was awaiting a decision on its application at the time of this acquisition.

¶ 5    On July 2, 2012, the Board issued a notice to Best that it intended to deny Best's licensure application. Best requested a hearing at which it intended to contest that denial. On July 17,

2012, Best assigned the Metro Agreement to GEM, which was a licensed VGT-operating business. Two days later, the Board denied Best's hearing request.

¶ 6    On July 26, 2012, Sember entered into another exclusive-VGT-placement contract with Triple 7 Illinois, LLC, which was a licensed VGT-operating business. Da Lee's was still not a licensed establishment at the time it entered into this second agreement (the Triple 7 Agreement). Allegations were made that Sember signed the Triple 7 Agreement because Triple 7 told him that Best's licensure application had been denied and that the Metro Agreement was therefore invalid.

¶ 7    On August 9, 2012, Triple 7 filed a complaint for declaratory relief against GEM, in which it requested, *inter alia*, a ruling that the Metro Agreement was invalid. GEM filed a motion to dismiss, which the circuit court granted after a hearing. In its ruling, the court ruled that the Metro Agreement was not a "use agreement" under the Act and therefore did not violate the Act or any video gaming regulations. Triple 7 appealed that ruling.

¶ 8    While Triple 7's appeal was pending with this court, on October 10, 2012, Da Lee's filed a complaint against GEM, Best, and Metro. The complaint alleged that the Metro Agreement was invalid and sought injunctive relief to prevent GEM from enforcing the Metro Agreement. Further, the complaint contained several allegations of fraud. First, the complaint alleged that GEM committed fraud in that it represented to Da Lee's that the Metro Agreement had been validated by the Board and in that it falsified aspects of its terminal operator license. Second, the complaint alleged that Metro and Best committed fraud in that prior to entering into the Metro Agreement, Metro had agreed to sell its business to Best and that, as part of that agreement, Metro was required to sign VGT-placement contracts with at least 35 establishments. Further, the complaint alleged that when Metro approached Da Lee's, Metro told Da Lee's that it would remain a family-owned business and that, upon Da Lee's signing the agreement, it would immediately transmit the signed VGT-placement agreement "to preserve [Da Lee's] place in line for licensure as a licensed Establishment." The complaint requested a declaratory judgment that the Metro Agreement was invalid, as well as compensatory damages, punitive damages, and injunctive relief.

¶ 9    Motions to dismiss the complaint pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2012)) were filed and were heard by the circuit court.[1] The court issued an order granting the motions to dismiss. The court dismissed the first three counts with prejudice and the fourth count without prejudice. The court also found that there was no just reason to delay the enforcement or appeal of the order dismissing the first three counts with prejudice. Da Lee's did not replead count IV, but did file a motion to reconsider. The circuit court denied Da Lee's motion to reconsider, dismissed count IV with prejudice, and made its order *nunc pro tunc* to the date of the prior dismissal order. Da Lee's appealed.

¶ 10                                                    ANALYSIS

¶ 11    Da Lee's argues in this appeal that the circuit court's decision was erroneous because the Metro Agreement is invalid and unenforceable in that it: (1) is an illegal contract for gambling; (2) was not between a licensed VGT operator and a licensed establishment, as required by regulations on "use agreements"; (3) was assigned both to and from unlicensed VGT

---

[1]The appellant did not file a report of proceedings with the record on appeal.

operators, in violation of the regulations on "use agreements"; and (4) was immediately invalidated by the Board denying Best's licensure application.

¶ 12     We note that Da Lee's appellant's brief and GEM's response brief were filed in this case while the Triple 7 appeal was still pending. On July 26, 2013, this court issued an opinion in the Triple 7 appeal that affirmed the circuit court's decision. *Triple 7 Illinois, LLC v. Gaming & Entertainment Management-Illinois, LLC*, 2013 IL App (3d) 120860. In so ruling, this court rejected Triple 7's arguments that: (1) the Metro Agreement was invalid because the Act permits the assignment of "use agreements" only by licensed VGT operators (*id.* ¶ 17); (2) the Act prohibits prelicensure agreements (*id.* ¶¶ 20-23); (3) the Metro Agreement was invalid because it was a contract for the unlicensed performance of an act (*id.* ¶ 28); and (4) the Metro Agreement was invalidated at the time that the Board denied Best's licensure application (*id.* ¶ 31).

¶ 13     Da Lee's reply brief was filed in this case after this court issued its decision in *Triple 7*. In that brief, Da Lee's claims that *Triple 7* was wrongly decided because the Board's website indicates that prelicensure agreements are "use agreements" and because public policy favors a ruling that prohibits the assignments of the Metro Agreement. Da Lee's also claims in its reply brief that modifications that the Board made to its website's "Frequently Asked Questions (FAQs)" section after the *Triple 7* decision was issued indicate that the Board disagrees with that decision, and that this court should therefore defer to this construction of the Act.[2]

¶ 14     Under the doctrine of *res judicata*:

> " '[A] final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action.' [*Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 334 (1996).] *Res judicata* bars not only what was actually decided in the first action but also whatever could have been decided. *La Salle National Bank v. County Board of School Trustees*, 61 Ill. 2d 524, 529 (1975). Three requirements must be satisfied for *res judicata* to apply: (1) a final judgment on the merits has been rendered by a court of competent jurisdiction; (2) an identity of cause of action exists; and (3) the parties or their privies are identical in both actions. *Downing v. Chicago Transit Authority*, 162 Ill. 2d 70, 73-74 (1994)." *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008).

¶ 15     The three requirements for *res judicata* to apply in this case have been met. First, our decision in *Triple 7* was a final judgment on the merits in that it declared the Metro Agreement was valid. See *Style Builders, Inc. v. Fuernstahl*, 32 Ill. App. 3d 272, 275 (1975) ("[a] judgment is on the merits when it amounts to a decision as to the respective rights and liabilities of the parties, based on the ultimate facts or state of facts disclosed by the pleadings or evidence, or both, and on which the right of recovery depends"). Second, an identity of cause of action exists between the *Triple 7* action and this action, as both actions sought to invalidate the Metro Agreement under the same set of operative facts. See *Rein*, 172 Ill. 2d at 339. *Cartwright v. Moore*, 394 Ill. App. 3d 1, 7-8 (2009). Third, Da Lee's is in privity with the parties from the *Triple 7* action, as Da Lee's interests were affected by our decision in *Triple 7*. See *Hayes v. State Teacher Certification Board*, 359 Ill. App. 3d 1153, 1164 (2005) (outlining the general principles behind privity). Under these circumstances, we hold that *res judicata*

---

[2]GEM filed a motion to strike this portion of Da Lee's reply brief. We have reviewed that motion and hereby deny it.

applies.[3] Accordingly, we hold that the circuit court did not err when it dismissed Da Lee's complaint.

¶ 16                                    CONCLUSION
¶ 17        For the foregoing reasons, we affirm the judgment of the circuit court of La Salle County.

¶ 18        Affirmed.

¶ 19        JUSTICE SCHMIDT, dissenting.
¶ 20        I agree with Da Lee's that the agreement in this matter is invalid and that *Triple 7* was wrongly decided by this court. As such, I respectfully dissent from the majority's opinion to the contrary. Not only was the *Triple 7* decision wrong, it was palpably erroneous, *ergo* it cannot support the majority's *res judicata* theory. *People v. McDonald*, 366 Ill. App. 3d 243 (2006).

¶ 21        The *Triple 7* court acknowledged that our task in cases of statutory construction is to ascertain and give effect to the intent of the legislature. *Triple 7*, 2013 IL App (3d) 120860, ¶ 16. It is clear that the majority's analysis jumped the tracks right out of the station. A reading of *Triple 7* leads one to the inescapable conclusion that the majority worked off the underlying premise that gaming contracts are legal in this state unless prohibited by statute. Of course, the converse is true. Gambling and gambling contracts are illegal unless authorized by statute. See *Hall v. Montaleone*, 38 Ill. App. 3d 591, 592 (1976) (gambling contracts are absolutely void and unenforceable, by reason of public policy); *Brelsford v. Stoll*, 304 Ill. App. 222, 226 (1940) ("alleged contract was illegal and void from its inception as contravening the provisions of the gaming statutes of Illinois and against public policy and was therefore unenforceable"); *Schneider v. Turner*, 130 Ill. 28, 39 (1889) ("[n]othing is more clearly and firmly established by the common law, than that all gambling contracts are void"); *Mallett v. Butcher*, 41 Ill. 382, 383 (1866) (all contracts having their origin in gaming are void, not voidable, and it is immaterial when or how the fact is made patent to the court).

¶ 22        The agreement at issue in this matter is undoubtedly a contract for gambling as it calls for the terminal operator and Da Lee's to evenly split gambling proceeds, termed "Net Terminal Income." The "50/50 split" of gambling revenues between a terminal operator and an establishment is mandated by the Video Gaming Act (230 ILCS 40/25(c) (West 2012)). As a contract for gambling, the agreement is only valid and enforceable if specifically allowed for by statute. *Hall*, 38 Ill. App. 3d at 592. Neither the Video Gaming Act (the Act) (230 ILCS 40/1 *et seq.* (West 2010)) nor the administrative rules adopted by the Illinois Gaming Board (11 Ill. Adm. Code 1800.110 *et seq.* (2013)) specifically allow for a gaming contract between an establishment and unlicensed terminal operator. Through its regulations, the Board has made it clear that assignment of a use agreement can only take place between licensed terminal

---

[3]We note that at oral argument, Da Lee's focused on its argument that the Metro Agreement was void because it was an illegal contract for gaming. We decline to address this argument, as it was not raised for the first time until this appeal. See *Hudson*, 228 Ill. 2d at 467 ("*[r]es judicata* bars not only what was actually decided in the first action but also whatever could have been decided").

operators. As neither Metro nor Best was ever a licensed terminal operator, I find the contract is void and unenforceable.

¶ 23  As noted in *Triple 7*, in 2009 our legislature passed the Act, which legalizes the use of video gambling terminals in Illinois subject to the regulations enacted by the Board. 230 ILCS 40/1 *et seq.* (West 2012); *Triple 7*, 2013 IL App (3d) 120860, ¶ 10. Restaurants such as Da Lee's may become licensed establishments, which, in turn allows the placement and operation of video gaming terminals. *Id.*; 230 ILCS 40/5 (West 2012). The entity that owns the terminals is termed a "terminal operator," which the Act defines as an "individual, partnership, corporation, or limited liability company that is licensed under this Act and that owns, services, and maintains video gaming terminals for placement in licensed establishments, licensed truck stop establishments, licensed fraternal establishments, or licensed veterans establishments." 230 ILCS 40/5 (West 2012).

¶ 24  The Act prohibits the placement of video gaming terminals in establishments unless the establishment "has entered into a written use agreement with the terminal operator for placement of the terminals." 230 ILCS 40/25(e) (West 2012). While the Act does not define the term "use agreement" or define the proper parameters for such an agreement, the Act does direct the Illinois Gaming Board to "adopt rules" and establish "criteria to preserve the integrity and security of video gaming in this State." 230 ILCS 40/15 (West 2012). The Act also directs the Board to "adopt rules for the purpose of administering the provisions of this Act and to prescribe rules, regulations, and conditions under which all video gaming in the State shall be conducted." 230 ILCS 40/78 (West 2012).

¶ 25  Pursuant to this directive, the Board adopted numerous administrative regulations. See 11 Ill. Adm. Code 1800.110 *et seq.* (2013). These rules, in pertinent part, state:

> "For purposes of this Part the following terms shall have the following meanings:
>
> * * *
>
> 'Use agreement': A contractual agreement between a licensed terminal operator and a licensed video gaming location establishing terms and conditions for placement and operation of video gaming terminals by the licensed terminal operator within the premises of the licensed video gaming location." 11 Ill. Adm. Code 1800.110 (2013).

The regulations continue:

> "In addition to the requirements set forth in the Act, a Use Agreement must satisfy the following:
>
> a) Only be between a licensed terminal operator and a licensed establishment, licensed truck stop establishment, licensed veterans establishment or licensed fraternal establishment;
>
> b) Contain an affirmative statement that no inducement was offered or accepted regarding the placement or operation of video gaming terminals in a licensed establishment, licensed truck stop establishment, licensed veterans establishment or licensed fraternal establishment;
>
> c) Contain an indemnity and hold harmless provision on behalf of the State, the Board, and its agents relative to any cause of action arising from a use agreement;
>
> d) Prohibit any assignment other than from a licensed terminal operator to another licensed terminal operator.

e) Contain a provision that releases the video gaming location from any continuing contractual obligation to the terminal operator in the event that the terminal operator has its license revoked or surrenders its license." 11 Ill. Adm. Code 1800.320 (2013).

¶ 26 The *Triple 7* court acknowledged that the contract could not be a "use agreement" since neither Da Lee's nor Best was licensed at the time of signing. *Triple 7*, 2013 IL App (3d) 120860, ¶ 17 ("Here, neither Metro nor Da Lee's was licensed under the Act when it signed the placement agreement. Thus, the Da Lee's Agreement is not a use agreement. Therefore, the rules and regulations prohibiting the assignment of a use agreement do not apply to the agreement assigned to GEM."). However, the *Triple 7* court missed the obvious import of those facts: since they were not "use agreements," they were illegal gaming contracts and, therefore, void.

¶ 27 Again, the agreement at issue in this matter and in *Triple 7* calls for Da Lee's to split gambling revenues with the terminal operator, rendering it invalid unless specifically permitted by statute. *Hall*, 38 Ill. App. 3d at 592. The Act directs the Board to enact regulations defining the steps necessary to enter into and assign these gambling contracts, which the Board did. Those regulations have the full force and effect of law. *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 38.

¶ 28 Clearly, section 1800.320(d) (11 Ill. Adm. Code 1800.320(d) (2013)), which prohibits the assignment of any use agreement "other than from a licensed terminal operator to another licensed terminal operator," renders Metro's assignment to Best and Best's assignment to GEM ineffective as neither Metro nor Best was ever a licensed terminal operator. While the *Triple 7* court disagreed, a review of the court's reasoning reveals its error. *Triple 7*, 2013 IL App (3d) 120860, ¶ 17.

¶ 29 The authority cited by the *Triple 7* court to support its contention that the agreement is enforceable is found neither in the Act itself nor the Illinois Administrative Code. Instead, the *Triple 7* court referenced language contained in an application for licensure to support its theory that the legislature and the Board intended to allow unlicensed entities to enter into gaming contracts. Characterizing it as "regulatory language," the *Triple 7* court noted that in "section 8 of the application, the Board asks the applicant to list all businesses with which the applicant has entered into an agreement for the placement of terminals." *Id.* ¶ 20. Noticeably absent from the *Triple 7* opinion is citation to any authority supporting the contention that wording on an application for a license evinces an administrative agency's interpretation of its enabling legislation or the legislature's intent in enacting a statute.

¶ 30 I find the actual administrative rules enacted by the Board much more indicative of intent and authoritative than the wording of a potential licensee's application. Those rules, again, "[p]rohibit any assignment other than from a licensed terminal operator to another licensed terminal operator." 11 Ill. Adm. Code 1800.320 (2013). More importantly, nowhere do these rules allow for unlicensed entities to enter into gaming contracts.

¶ 31 The *Triple 7* court confused the issue when stating that "[n]othing in the Act or the regulations prohibits the prelicensure placement agreement entered into by Da Lee's and Metro." *Triple 7*, 2013 IL App (3d) 120860, ¶ 21. Well, nothing in the Act or regulations authorized it either. Again, it seems clear that the *Triple 7* court was working off of the premise that gaming contracts are legal unless specifically prohibited.

¶ 32    The *Triple 7* court acknowledged that the Administrative Code defines a use agreement as an agreement between a licensed operator and a licensed location, and further acknowledges that the initial contract between Metro and Da Lee's was not a use agreement under the Act and, therefore, "the rules and regulations prohibiting the assignment of a use agreement do not apply to the agreement assigned to GEM." *Triple 7*, 2013 IL App (3d) 120860, ¶ 17.

¶ 33    If, as the court correctly acknowledged, the contract between Metro and Da Lee's was not a use agreement under the Act, then it was an illegal gaming contract. So ultimately, the court concludes that contracts that are illegal at their inception and, therefore, void could be resurrected by assigning them to someone who later becomes licensed to enter into gaming contracts. How any reasonable person could believe that that was the intent of the legislature is a mystery to me.

¶ 34    I feel it necessary to discuss the *Triple 7* "analysis" because if the decision is not palpably erroneous, it would have *res judicata* effect on the case before us. As should be obvious by a reading of *Triple 7* and as discussed below, to call the *Triple 7* decision palpably erroneous is to be quite charitable.

¶ 35    The *Triple 7* court rejected the argument that the Administrative Code can only be read to mean that only licensed terminal operators can enter into contracts for the placement and operation of video gaming terminals. It found three problems with that argument. First, the court held that to construe the statute and regulations that way would require it to ignore language used by the Board in license applications, which asks the applicant to list all businesses with which the applicant has an agreement for the placement of terminals. The court concluded that the language in the application was "regulatory language," which "anticipates that a terminal operator may have entered into placement agreements prior to its approval as a licensed operator under the Act." *Id.* ¶ 20.

¶ 36    What is wrong with this analysis? First of all, the court cited no authority for the proposition that it has to look to applications prepared by the Board in an effort to construe the Video Gaming Act. In fact, the *Triple 7* court created a new rule of statutory construction: ignore statutory language and look to see what some bureaucrat drafted in a license application. Second, by concentrating on the language in the application, the court ignored not only the plain language of the Act and regulations, but also the purpose and spirit of the Act: that was to try to keep unsavory types out of the licensed gaming business. Third, the analysis ignored the fact that the applicant in this case did not enter into an agreement for placement of terminals. Metro Amusements, Inc., entered into the contract with Da Lee's in June of 2010. Metro was never licensed. The Board denied its application. Now, I suppose that had Metro ultimately been licensed, there might be at least some merit to the court's reliance on the application language. However, had Metro ultimately been licensed, we would have another case than the one before us and the one before the *Triple 7* court. I suspect that if that application language could ever have any relevance, it would only be in the case of *successful* applicants.

¶ 37    The *Triple 7* court also states, "[t]his regulatory language anticipates that a terminal operator may have entered into placement agreements prior to its approval as a licensed operator under the Act." *Id.* Again, even if that were true, the party before the *Triple 7* court was GEM. GEM did not enter into a placement agreement prior to its approval as a licensed operator under the Act. It purchased the contract from someone who could not get licensed. No

- 8 -

reasonable argument can be made that the regulatory language or the statute anticipated that scenario.

¶ 38    Next, the *Triple 7* court reasoned that neither the Act nor the regulations imposed limitations on prelicensure contracts. *Id.* ¶ 21. Again, I state the obvious: "Prelicensure placement agreements" are simply gaming contracts, which are illegal. There is no need for the Act or the regulations to limit that which was already illegal. The *Triple 7* court seemed to have concluded that by passing the Video Gaming Act, the legislature intended to make all gambling contracts legal unless prohibited by the Act. In support of that proposition, the court said, "we cannot rewrite a statute and depart from its plain language by reading into it limitations or conditions not expressed by the legislature." *Id.* So, I ask, where in the plain language of the statute does the court find intent to allow gaming contracts between unlicensed individuals or corporations?

¶ 39    Saving the best for last, the *Triple 7* court said, "[t]hird, interpreting the regulations to apply to agreements between nonlicensed entities would violate the right of private parties to freely contract. See U.S. Const., art. I, § 10; Ill. Const. 1970, art. I, § 16." *Id.* ¶ 22. So, the *Triple 7* court based its holding on the previously unheard of proposition that the contract clauses of the United States and Illinois Constitutions protect the right to enter into gambling contracts. That is, there is a constitutional right to gamble. I am thinking that is not exactly correct.

¶ 40    Aside from the obvious, neither the Act nor the regulations envision nonlicensed parties entering into and transferring these gaming contracts. The *Triple 7* decision permits exactly that which the Act and regulations were designed to prohibit: racketeer influence in legalized gambling. This decision allows mobsters to enter into gaming contracts and then sell those contracts to others who can get licensed. This is not what the legislature envisioned (I hope).

¶ 41    Later, the *Triple 7* court acknowledges that if a licensed terminal operator has its license revoked or surrenders its license, the gaming location is released from any contractual obligations. However, the court concluded that at the time Best sold the contract to GEM, the denial of its application was not final, thus giving an operator who was never granted a license rights superior to one who was licensed and then had the license revoked. This, again, strikes me as counterintuitive and simply wrong. This would not make sense even if the underlying contract was not void. It is also without support in the statutory language.

¶ 42    I would reverse the trial court and, therefore, respectfully dissent.