NOTICE

Decision filed 08/07/15. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2015 IL App (5th) 140092

NO. 5-14-0092

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| J&J VENTURES GAMING, LLC, an Illinois Limited Liability Company, and ACTION GAMING, LLC, an Illinois Limited Liability Company, | ) ) ) | Appeal from the Circuit Court of Madison County. |
| | ) | |
| Plaintiffs-Appellees and Cross-Appellants, | ) | |
| | ) | |
| v. | ) | No. 13-MR-85 |
| | ) | |
| WILD, INC., d/b/a Wild Country, an Illinois Corporation, | ) ) | |
| | ) | |
| Defendant | ) | |
| | ) | Honorable |
| (Accel Entertainment Gaming, LLC, Intervenor-Appellant and Cross-Appellee). | ) ) | Donald M. Flack, Judge, presiding. |

_____

JUSTICE STEWART delivered the judgment of the court, with opinion.
Justices Goldenhersh and Schwarm concurred in the judgment and opinion.

**OPINION**

¶ 1    This case involves a conflict between two companies claiming to have exclusive contractual rights for the placement of video gaming terminals in an establishment owned by the defendant, Wild, Inc., doing business as Wild Country, pursuant to the Video Gaming Act (the Act) (230 ILCS 40/1 *et seq.* (West 2012)).  "Video gaming terminals" are electronic machines that accept cash or electronic cards or vouchers for the purpose of

1

allowing users to play games such as video poker or blackjack. 230 ILCS 40/5 (West 2012). A "terminal operator" is a person or entity licensed under the Act that owns, services, and maintains video gaming terminals for placement in licensed establishments. 230 ILCS 40/5 (West 2012).

¶ 2 Under the language of the Act, a terminal operator's right to place video gaming terminals in a particular location must be established by a "written use agreement" with the owner of the establishment. 230 ILCS 40/25(e) (West 2012). The plaintiff, J&J Ventures Gaming, LLC (J&J Ventures Gaming), maintains that it has an exclusive right to place video gaming terminals in Wild Country's establishment by virtue of a written use agreement that preceded any other agreements for the placement of the machines in Wild Country's establishment. The intervenor, Accel Entertainment Gaming, LLC (Accel Entertainment), however, maintains that it entered into the only valid use agreement with Wild Country for the placement of video gaming terminals. It argues that the agreement upon which J&J Ventures Gaming relies is not a valid use agreement under the Act because it was created and then assigned to J&J Ventures Gaming by two entities that were never licensed to operate video gaming terminals under the Act.

¶ 3 J&J Ventures Gaming filed a lawsuit against Wild Country requesting the court to enter a declaratory judgment establishing that it had the exclusive right to be the video gaming terminal operator for Wild Country's establishment until the expiration of the term of its use agreement. The circuit court granted Accel Entertainment's request to intervene in the lawsuit over J&J Ventures Gaming's objection. After a hearing, the circuit court concluded that J&J Ventures Gaming had a valid, binding, and enforceable

2

use agreement with Wild Country that preceded Accel Entertainment's use agreement. The court, therefore, enjoined Accel Entertainment from operating video gaming terminals within Wild Country's establishment and ordered it to remove any video gaming terminals it had installed at the establishment.

¶ 4    Accel Entertainment appeals the circuit court's judgment, arguing that J&J Ventures Gaming's contract is not a valid and enforceable use agreement under the Act. J&J Ventures Gaming cross-appeals the circuit court's order allowing Accel Entertainment to intervene in the lawsuit.   For the following reasons, we vacate the circuit court's judgment and dismiss this cause for a lack of subject matter jurisdiction.

¶ 5                             BACKGROUND

¶ 6    The legislature enacted the Act on July 13, 2009.  Pub. Act 96-34 (eff. July 13, 2009).  The Act legalized the use of video gaming terminals for gambling purposes for the first time within the State of Illinois.  This new video gaming industry is subject to extensive regulations under the statute's comprehensive regulatory scheme.  The Act requires the Illinois Gaming Board (the Gaming Board) to license all entities having video gaming terminals installed in their establishments (licensed establishments) and license all entities seeking to place and operate video gaming terminals (licensed terminal operators) within licensed establishments.  230 ILCS 40/25(c), (e) (West 2012).  Without a license issued by the Gaming Board, no person or entity can legally engage in the operation of video gaming terminals for gambling purposes.

¶ 7    When the legislature enacted the video gaming statute in 2009, video gaming did not begin immediately.  Instead, there was a three-year start-up period before actual video

3

gaming began. Video gaming terminals did not go "live" until October 9, 2012. During this start-up period, unlicensed persons and entities entered into agreements with establishments that hoped to become licensed establishments under the Act. These agreements purported to grant the unlicensed party the exclusive right to place video gaming terminals in the other party's establishment upon each party obtaining its respective licenses under the Act.

¶ 8    The dispute in the present case stems from such an agreement initially entered into between Wild Country and another entity that is not a party to this lawsuit, Action Amusement Company (Action Amusement). Wild Country entered into the agreement with Action Amusement on August 17, 2009. This agreement purported to be an "Exclusive Location And Video Gaming Terminal Agreement" (exclusive location agreement, or agreement) granting Action Amusement the exclusive right to place video gaming terminals in Wild Country's establishment.

¶ 9    The parties entered into the exclusive location agreement before the Gaming Board had established any rules for implementing the Act. Therefore, the Gaming Board had not licensed either party when they entered into this agreement. However, the agreement states that Action Amusement "is or shall become" a licensed terminal operator under the Act and that Wild Country "is or shall become" a licensed establishment under the Act. The stated purpose of the contract is for "placing and operating video gaming terminals" in Wild Country's establishment for a period of 60 months, beginning when the first video gaming terminal begins operating in the establishment. The agreement states that Action Amusement "shall have the exclusive

4

right to place video gaming terminals" in Wild Country's establishment during the term of the agreement and that the agreement "shall be binding upon and inure to the benefit of the representative legal representatives, successors and assigns of the parties hereto."

¶ 10 The Act does not specify any requirements that an agreement must meet in order to be a valid "use agreement" for the placement of video gaming terminals. However, rules promulgated by the Gaming Board after the effective date of the Act (and after the date of the exclusive location agreement) set out minimum standards for use agreements, including that they must be between a licensed terminal operator and a licensed establishment. See 11 Ill. Adm. Code 1800.320 (2012).

¶ 11 On October 5, 2010, Action Amusement assigned its rights under various exclusive location agreements, including its rights under its agreement with Wild Country, to another entity, Action Gaming, LLC (Action Gaming). Action Amusement never became a licensed terminal operator under the Act. Nonetheless, the terms of the assignment provided that Action Amusement would receive compensation that is directly tied to video gaming operations. Under the assignment, Action Amusement is to receive compensation from Action Gaming in the amount of $10,000 per month on the first day of each month following execution of assignment until August 1, 2011. After August 1, 2011, Action Amusement would receive additional compensation once Action Gaming operated video gaming terminals in 70 of the locations included in the assignment. Once Action Gaming began operating in 70 locations, Action Amusement would receive $20,000 per month for a period of 10 years provided that Action Gaming maintained operation of video gaming terminals in 70 or more locations.

5

¶ 12    At the time that Action Gaming entered into this assignment with Action Amusement, it was also not a licensed terminal operator under the Act, but it intended to obtain the necessary licensing. However, as explained below, the Gaming Board later denied Action Gaming's request for a license.

¶ 13    On January 12, 2012, while Action Gaming's application for a terminal operator's license was pending before the Gaming Board, Wild Country and Action Gaming signed a document purporting to be an amendment to the exclusive location agreement. In the amendment, the parties acknowledged that Action Gaming, rather than Action Amusement, was now a party to the exclusive location agreement. The parties also noted that amendments to the exclusive location agreement were necessary in order for the contract to comply with the Act "and the rules and regulations promulgated thereunder."

¶ 14    The rules promulgated by the Gaming Board after the enactment of the Act "[p]rohibit any assignment [of use agreements] other than from a licensed terminal operator to another licensed terminal operator." 11 Ill. Adm. Code 1800.320(d) (2012). Accordingly, the January 12, 2012, amendment to the parties' exclusive location agreement added additional language addressing the right to assign the agreement by the "Terminal Operator" as follows:

>        "Assignment of Agreement by Terminal Operator: Prior to Terminal Operator being licensed as a 'terminal operator' pursuant to the Act and the rules and regulations promulgated thereunder (collectively, the 'Video Gaming Law'), Terminal Operator may freely assign and/or transfer this Agreement and its rights and/or obligations hereunder, subject to the Video Gaming Law. After Terminal

6

Operator becomes a licensed terminal operator, Terminal Operator may not assign and/or transfer this Agreement and its rights and/or obligations hereunder except: (i) to another licensed terminal operator; or (ii) as may otherwise be permitted by the Video Gaming Law."

¶ 15 The amendment to the contract also included a provision concerning approval of the Gaming Board as follows:

"The parties acknowledge that this Amendment and the Agreement are subject to and contingent upon the Illinois Gaming Board's (the 'IGB') review of, and to the extent required by the IGB, consent to the use of this Amendment. To that end, the parties agree to submit this Amendment to the IGB with any licensing application and to cooperate with each other in obtaining the IGB's consent, if required. The parties agree to modify or amend this Amendment to comply with the requirements of the IGB or any change in the Illinois Video Gaming Act or the rules and regulations promulgated thereunder."

¶ 16 On July 19, 2012, the Gaming Board issued a preliminary notice of denial of Action Gaming's application to become a licensed terminal operator. In a correspondence dated July 30, 2012, the Gaming Board informed Action Gaming that it did not meet the requirements for licensing under the Act. Specifically, the Gaming Board noted that Action Gaming "through its employees and owners Nicky Nichols and Jason L. Rowell have associated both personally and professionally with James Koehler, who has a gambling conviction." In addition, Nichols "has associated in business affairs with not only Mr. Koehler, but also others of questionable character." The Gaming

7

Board concluded that Nichols had also "engaged in questionable business practices related to business transactions with convicted felon[s], Tim Whitmer and Tim Coulon," and "has a questionable association with felon, Robert Guirdry." With respect to Rowell, the Gaming Board found that he "failed to disclose portions of his criminal record, and was untruthful with police during the course of one of his arrests." The Gaming Board concluded, therefore, that Action Gaming failed to meet the requirements set forth in sections 45(a), (d), and (e) of the Act (230 ILCS 40/45(a), (d), (e) (West 2012)).

¶ 17 Action Gaming petitioned the Gaming Board for a hearing. See 11 Ill. Adm. Code 1800.615(c) (2012). Under the rules promulgated by the Gaming Board, "[a] request for hearing is deemed to be granted unless denied." 11 Ill. Adm. Code 1800.615(g) (2012). In addition, under the rules, an applicant who has been denied a license and who has requested a hearing is still considered an applicant until final resolution of the request for hearing. 11 Ill. Adm. Code 1800.695 (2012).

¶ 18 On August 24, 2012, while Action Gaming's request for hearing was pending before the Gaming Board, Action Gaming entered into an asset purchase agreement with J&J Ventures Gaming in which Action Gaming assigned its rights, title, and interest in all of its exclusive location agreements, including the agreement with Wild Country, to J&J Ventures Gaming. Prior to this assignment, the Gaming Board had approved J&J Ventures Gaming as a licensed terminal operator under the Act.

¶ 19 Under the terms of the asset purchase agreement with J&J Ventures Gaming, Action Gaming would profit from J&J Ventures Gaming's future video gaming operations by receiving future monetary compensation from J&J Ventures Gaming in

8

exchange for the exclusive right to place and operate video gaming terminals in the locations included in the agreement, including Wild Country's establishment. The amount of compensation Action Gaming is to receive under the asset purchase agreement has been redacted from the copy of the agreement that is included in the record on appeal. It is apparent from the unredacted portions of the asset purchase agreement, however, that the compensation that Action Gaming will receive under the contract is dependent on the extent to which J&J Ventures Gaming operates video gaming terminals in the licensed establishments that had been under contract with Action Gaming, including Wild Country.

¶ 20 On August 29, 2012, Wild Country entered into a new use agreement with the intervenor, Accel Entertainment, that granted Accel Entertainment the exclusive right to place video gaming terminals in Wild Country's establishment. At the time of this agreement, the Gaming Board had granted Accel Entertainment a license to be a terminal operator.

¶ 21 On September 20, 2012, the Gaming Board denied Action Gaming's request for a hearing on its application to become a licensed terminal operator. The Gaming Board's denial of the request for hearing was its final decision, and the denial of licensure became the final order on the date the Gaming Board denied the request for hearing. See 11 Ill. Adm. Code 1800.615(g) (2012).

¶ 22 On March 18, 2013, J&J Ventures Gaming (along with Action Gaming as a coplaintiff) filed a complaint against Wild Country seeking a declaratory judgment from the circuit court establishing that J&J Ventures Gaming has the exclusive right to place

9

video gaming terminals in Wild Country's establishment. At that time, the Gaming Board had not yet granted Wild Country's application to be a licensed establishment. The Gaming Board granted Wild Country's application to become a licensed establishment on October 24, 2013.

¶ 23 Accel Entertainment filed a petition for leave to intervene in the lawsuit, which the circuit court granted over J&J Ventures Gaming and Action Gaming's objection. Accel Entertainment alleged in its counterclaim that the original exclusive placement agreement between Wild Country and Action Amusement was not an enforceable use agreement under the Video Gaming Act because the agreement was not signed by a licensed terminal operator, but was between Wild Country and an unlicensed entity, Action Amusement. Accel Entertainment maintained that its use agreement with Wild Country was the only valid use agreement because it was the only agreement signed by a licensed terminal operator. J&J Ventures Gaming, however, argued that its assignment of the original exclusive location agreement was valid under common law contract principles and was not prohibited by either the terms of the Act or the rules for implementing the statute promulgated by the Gaming Board.

¶ 24 While the present case was pending in the circuit court, on July 26, 2013, the Third District of the appellate court issued an opinion in *Triple 7 Illinois, LLC v. Gaming & Entertainment Management-Illinois, LLC*, 2013 IL App (3d) 120860, 992 N.E.2d 1251, in which the court addressed the validity of an agreement similar to J&J Ventures Gaming's exclusive location agreement in the present case. The *Triple 7* court held that a "precursor" agreement for the placement of video gaming terminals, entered into between

an unlicensed entity hoping to become a licensed terminal operator and a proposed licensed establishment, was valid and could be freely assigned and transferred among unlicensed entities prior to the parties to the agreement becoming licensed under the Act. *Triple 7*, 2013 IL App (3d) 120860, ¶ 23, 992 N.E.2d 1251. The court stated, "The agreement is not invalid; it simply cannot be enforced under the Act until the parties' applications are approved by the Gaming Board." *Id.* "Once the parties are licensed," the court continued, "the terms of the agreement can be fulfilled under the Act and the agreement cannot be assigned" except to other licensed terminal operators. *Id.*

¶ 25 In Illinois, decisions of an appellate court are binding precedent on all circuit courts regardless of locale. *People v. Carpenter*, 228 Ill. 2d 250, 259, 888 N.E.2d 105, 111 (2008). When conflicts arise between appellate court districts, the circuit court is bound by the decisions of the appellate court of the district in which it sits. *Aleckson v. Village of Round Lake Park*, 176 Ill. 2d 82, 92, 679 N.E.2d 1224, 1229 (1997).

¶ 26 On February 11, 2014, the circuit court entered an order granting J&J Ventures Gaming and Action Gaming's request for declaratory judgment. The *Triple 7* decision was the only appellate court case addressing the validity of precursor agreements purporting to control the placement of video gaming terminals. Therefore, the circuit court held that, based on the *Triple 7* court's holding, it was "compelled to find that the Agreement between J&J [Ventures Gaming] and Wild [Country] is valid, binding and enforceable." The court concluded that J&J Ventures Gaming "possesses the exclusive rights to serve as terminal operator and operate video gaming terminals at Wild [Country] until the expiration of that Agreement, which is 60 months from the date [J&J Ventures

Gaming's] first video gaming terminal first operates at Wild [Country]." The court held that Wild Country's use of video gaming terminals from any operator, other than J&J Ventures Gaming, was a breach of the contract and enjoined Wild Country and Accel Entertainment from activating video gaming terminals at Wild Country's establishment other than video gaming terminals provided and serviced by J&J Ventures Gaming.

¶ 27    The circuit court denied Accel Entertainment's motion to reconsider, and Accel Entertainment timely filed a notice of appeal. J&J Ventures Gaming and Action Gaming filed a cross-appeal of the circuit court's order allowing Accel Entertainment to intervene in the proceeding.

¶ 28                                   DISCUSSION

¶ 29    During oral arguments in this appeal, we *sua sponte* raised the issue of whether the circuit court has jurisdiction over the controversy raised in the plaintiffs' complaint or whether the Gaming Board has exclusive or primary jurisdiction over the controversy. We directed the parties to submit supplemental briefs on this issue. Both parties maintain that the circuit court has jurisdiction over this controversy. However, upon review of the supplemental briefs and after further consideration of this jurisdiction issue, we believe that the Gaming Board has exclusive jurisdiction over the parties' controversy.

¶ 30    The central issue in this case concerns whether the exclusive location agreement, entered into between unlicensed entities, can control the placement of video gaming terminals once the agreement is assigned to a licensed terminal operator. Resolution of this controversy necessarily involves a determination of whether the original contract

12

along with the series of subsequent assignments constitute a valid "use agreement" under the Act and under the regulations enacted by the Gaming Board.

¶ 31    The assignments at issue purport to convey to unlicensed assignors the right to receive compensation that is directly tied to the future video gaming operations of the assignee. Enforcement of the exclusive location agreement and subsequent assignments as a use agreement, therefore, potentially allows entities that are unqualified for licensure under the Act to, nonetheless, profit from the legalization of video gaming in Illinois in a manner that appears to be contrary to the Act's legislative intent. As explained more fully below, the legislature granted the Gaming Board all powers necessary and proper to fully and effectively execute the provisions of the Act to further the Act's legislative purpose. We believe that these powers are exclusive and not concurrent with the circuit court's jurisdiction.

¶ 32    Under the Act, the Gaming Board's broad powers include the power to regulate who may and may not profit from video gaming through a strict licensing procedure and the regulation of the required terms of use agreements. Under this statutory and regulatory scheme, we believe that the legislature intended for the Gaming Board to have exclusive jurisdiction over all agreements purporting to control the placement of video gaming terminals within a licensed establishment, particularly when the agreements involve the potential distribution to unlicensed entities of monetary compensation that is directly linked to video gaming operations under the Act. These are issues that fall squarely within the Gaming Board's exclusive authority to supervise all video gaming operations.

13

¶ 33   The parties in this case did not raise any issue with respect to the circuit court's jurisdiction. They want the courts to decide this controversy. However, "[a] court has an independent duty to consider subject matter jurisdiction even when, as here, neither party raised it as an issue." *In re Rico L.*, 2012 IL App (1st) 113028, ¶ 109, 977 N.E.2d 1100. The parties cannot convey subject matter jurisdiction to a court by stipulation, consent, or waiver. *In re Marriage of Epting*, 2012 IL App (1st) 113727, ¶ 28, 994 N.E.2d 535.

¶ 34   Illinois courts have jurisdiction over all justiciable matters. *Employers Mutual Cos. v. Skilling*, 163 Ill. 2d 284, 287, 644 N.E.2d 1163, 1165 (1994). In administrative actions, however, the legislature may also vest exclusive original jurisdiction in an administrative agency. *People v. NL Industries*, 152 Ill. 2d 82, 96-97, 604 N.E.2d 349, 355 (1992). "Where the legislature enacts a comprehensive statutory scheme, creating rights and duties which have no counterpart in common law or equity, the legislature may define the 'justiciable matter' in such a way as to preclude or limit the jurisdiction of the circuit courts." *Board of Education of Warren Township High School District 121 v. Warren Township High School Federation of Teachers, Local 504*, 128 Ill. 2d 155, 165, 538 N.E.2d 524, 529 (1989). "However, if the legislative enactment does divest the circuit courts of their original jurisdiction through a comprehensive statutory administrative scheme, it must do so explicitly." *Skilling*, 163 Ill. 2d at 287, 644 N.E.2d at 1165.

¶ 35   With respect to administrative agencies, the term "jurisdiction" is not strictly applicable to an administrative body, but Illinois courts have used the term to designate the authority of the administrative body to act. *Byington v. Department of Agriculture*,

14

327 Ill. App. 3d 726, 730, 764 N.E.2d 576, 579-80 (2002). An administrative agency is different from a court because an agency only has the authorization given to it by the legislature. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 243, 555 N.E.2d 693, 716 (1989). "Since an administrative agency *** is a creature of statute, its jurisdiction or authority must be found within the provisions of the statute by which it acts." *Byington*, 327 Ill. App. 3d at 730, 764 N.E.2d at 580. An agency may adopt a rule and regulate an activity to the extent that a statute empowers the agency to do so. *Popejoy v. Zagel*, 115 Ill. App. 3d 9, 11, 449 N.E.2d 1373, 1374 (1983).

¶ 36    The operation of video gaming terminals for gambling purposes is not an activity that is recognized in Illinois except by virtue of the Act. There is no common law right in Illinois to operate, profit from, or assign profits from video gaming terminals. Under the common law, gambling contracts are void. *Tomm's Redemption, Inc. v. Park*, 333 Ill. App. 3d 1003, 1009, 777 N.E.2d 522, 527 (2002); *Semb's, Inc. v. Gaming & Entertainment Management-Illinois, LLC*, 2014 IL App (3d) 130111, ¶ 21, 12 N.E.3d 223 (Schmidt, J., dissenting). The passage of the Act created a new industry in Illinois, which is governed by new rules and procedures, and video gaming contracts that do not conform to the regulatory requirements are void. In our analysis, we must turn to the statutory framework of the Act to determine whether the legislature intended for the Gaming Board to have exclusive jurisdiction over the determination of the validity of agreements affecting the placement of and the distribution of income derived from the operation of video gaming terminals. *Crossroads Ford Truck Sales, Inc. v. Sterling*

15

*Truck Corp.*, 2011 IL 111611, ¶ 27, 959 N.E.2d 1133 ("Statutory interpretation is necessary to determine if the legislature intended to divest the circuit court of subject matter jurisdiction.").

¶ 37   "The interpretation of a statute is a question of law, which we review *de novo*." *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380, 899 N.E.2d 227, 232 (2008).  The court's "primary objective in interpreting a statute is to ascertain and give effect to the intent of the legislature." *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440, 925 N.E.2d 1113, 1117 (2010).  When interpreting the plain meaning of a statute, we consider the statute as a whole, the subject it addresses, and the legislature's apparent intent in enacting it.  *Id*.

¶ 38   We now turn to the language of the Act to determine the legislature's intent with respect to the Gaming Board's authority over transactions affecting the placement and operation of video gaming terminals.

¶ 39   The Gaming Board is a five-member board, appointed by the Governor and confirmed by the Senate.  230 ILCS 10/5(a)(2) (West 2012).  The Act expressly vests the Gaming Board with authority over all aspects of implementing the Act in order to prevent "practices detrimental to the public interest."  230 ILCS 40/78(a) (West 2012).  The legislature's enactment of the Act included an amendment to the Riverboat Gambling Act, in which the legislature allocated "responsibility for administration and enforcement of the Video Gaming Act to the Illinois Gaming Board."  *Wirtz v. Quinn*, 2011 IL 111903, ¶ 26, 953 N.E.2d 899; Pub. Act 96-34, § 940 (eff. July 13, 2009).

16

¶ 40    Section 78 of the Act sets out the authority of the Gaming Board with respect to implementing and supervising video gaming in Illinois as follows:

"(a) The Board shall have jurisdiction over and shall supervise all gaming operations governed by this Act.  The Board shall have all powers necessary and proper to fully and effectively execute the provisions of this Act, including, but not limited to, the following:

(1) To investigate applicants and determine the eligibility of applicants for licenses and to select among competing applicants the applicants which best serve the interests of the citizens of Illinois.

(2) To have jurisdiction and supervision over all video gaming operations in this State and all persons in establishments where video gaming operations are conducted.

(3) To adopt rules for the purpose of administering the provisions of this Act and to prescribe rules, regulations, and conditions under which all video gaming in the State shall be conducted.  Such rules and regulations are to provide for the prevention of practices detrimental to the public interest and for the best interests of video gaming, including rules and regulations regarding the inspection of such establishments and the review of any permits or licenses necessary to operate an establishment under any laws or regulations applicable to establishments and to impose penalties for violation of this Act and its rules."  230 ILCS 40/78(a) (West 2012).

17

¶ 41 In order to preserve the integrity of the gaming industry, the legislature outlined strict licensing procedures to prevent unsavory persons or entities from profiting from video gaming. Section 45 of the Act requires the Gaming Board, with the assistance of law enforcement, to conduct a background check of each person seeking and possessing a license under the Act. The Act defines findings by the Gaming Board, which require denial of a license as follows:

"(d) No person may be licensed *** if that person has been found by the Board to:

(1) have a background, including a criminal record, reputation, habits, social or business associations, or prior activities that pose a threat to the public interests of the State or to the security and integrity of video gaming;

(2) create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, and activities in the conduct of video gaming; or

(3) present questionable business practices and financial arrangements incidental to the conduct of video gaming activities." 230 ILCS 40/45(d) (West 2012).

¶ 42 Section 15 of the Act directs the Gaming Board to "adopt rules" and establish "criteria to preserve the integrity and security of video gaming in this State." 230 ILCS 40/15 (West 2012). Section 45 of the Act empowers the Gaming Board to "adopt rules to establish additional qualifications and requirements [for licensing] to preserve the integrity and security of video gaming" in Illinois. 230 ILCS 40/45(e) (West 2012). The

18

rules adopted by the Gaming Board prohibit it from granting a video gaming license to any applicant until the Gaming Board is satisfied that the applicant is, among other things:

"1) A person of good character, honesty and integrity;

2) A person whose background, including criminal record, reputation and associations, is not injurious to the public health, safety, morals, good order and general welfare of the people of the State of Illinois; [and]

3) A person whose background, including criminal record, reputation and associations, does not discredit or tend to discredit the Illinois gaming industry or the State of Illinois[.]"  11 Ill. Adm. Code 1800.420(a)(1)-(3) (2012).

¶ 43    In the context of the controversy in the present case, section 45 of the Act and the Gaming Board's licensing regulations are insightful in assessing the Gaming Board's authority, because the agreements at issue purport to allow unlicensed entities to receive compensation that is directly linked to video gaming operations.  The Gaming Board specifically found that Action Gaming was unfit for licensing under the Act because Nichols and Rowell have associated both personally and professionally with felons, a person with a gambling conviction, and "others of questionable character."  In addition, the Gaming Board found that Nichols had "engaged in questionable business practices related to business transactions with convicted felon[s]" and that Rowell "failed to disclose portions of his criminal record, and was untruthful with police during the course of one of his arrests."

19

¶ 44 The circuit court, however, in following the *Triple 7* decision, has usurped the Gaming Board's authority and has allowed Action Gaming to profit from video gaming in Illinois outside the regulatory scheme of this newly created industry. The court's decision undermines the Gaming Board's ability to control who may profit from the newly established video gaming industry by validating the transactions upon which J&J Ventures Gaming makes its claim. No reasonable interpretation of the Act and its regulatory scheme of this new industry, taken as a whole, can lead to a conclusion that the legislature intended the courts to make such decisions.

¶ 45 The rules established by the Gaming Board under the authority of the Act also set out minimum standards for use agreements. In section 1800.110, the Gaming Board defines the term "use agreement" as "[a] contractual agreement between a licensed terminal operator and a licensed video gaming location establishing terms and conditions for placement and operation of video gaming terminals by the licensed terminal operator within the premises of the licensed video gaming location." 11 Ill. Adm. Code 1800.110 (2012).

¶ 46 Section 1800.320 requires that use agreements:

"a) Only be between a licensed terminal operator and a licensed establishment ***;

b) Contain an affirmative statement that no inducement was offered or accepted regarding the placement or operation of video gaming terminals in a licensed establishment ***;

20

c) Contain an indemnity and hold harmless provision on behalf of the State, the Board, and its agents relative to any cause of action arising from a use agreement;

d) Prohibit any assignment other than from a licensed terminal operator to another licensed terminal operator;

e) Contain a provision that releases the video gaming location from any continuing contractual obligation to the terminal operator in the event that the terminal operator has its licensed revoked or surrenders its license." 11 Ill. Adm. Code 1800.320 (2012).

*Semb's, Inc.*, 2014 IL App (3d) 130111, ¶ 25, 12 N.E.3d 223 (Schmidt, J., dissenting).

¶ 47 These rules are meant to control who may or may not profit from the legalization of video gaming (licensed establishments and licensed terminal operators) and are meant to regulate contracts (use agreements) affecting entities operating in and profiting from the video gaming industry in Illinois. This regulatory framework concerning minimum requirements of use agreements stems from the Gaming Board's authority to regulate the "conditions under which all video gaming in the State shall be conducted." 230 ILCS 40/78(a) (West 2012). Whether the agreement and assignments at issue in the present case violate section 1800.320's requirements or are otherwise prohibited is a question we believe the legislature intended for the Gaming Board to decide exclusively, because it is an issue that could directly impact the integrity and security of video gaming in this State and that otherwise concerns the conditions under which video gaming in this State shall be conducted.

21

¶ 48 Nothing within this regulatory framework evidences a legislative intent that the circuit courts have concurrent jurisdiction over matters directly relating to what may or may not constitute a valid use agreement for placing machines in a licensed establishment. Instead, the regulatory scheme is an explicit declaration by the legislature that the Gaming Board has authority over the placement and operation of video gaming terminals. This regulatory scheme may be frustrated if the courts allow a person lacking "good character, honesty and integrity" to circumvent the regulatory framework by entering into agreements for the exclusive placement of video gaming terminals and assign the contracts to a licensed entity in return for compensation directly linked to video gaming operations. Whether this contractual scheme violates the Act and the Gaming Board's regulations concerning use agreements and licensing requirements is an exclusive question for the Gaming Board.

¶ 49 The Gaming Board's authority as defined by the Act is also supplemented by its authority that the legislature outlined in the Illinois Riverboat Gambling Act. Section 80 of the Act states that the "provisions of the Illinois Riverboat Gambling Act, and all rules promulgated thereunder, shall apply to the Video Gaming Act, except where there is a conflict between the 2 Acts." 230 ILCS 40/80 (West 2012). The Riverboat Gambling Act, in turn, notes that the legislature's intention in legalizing gambling is to promote Illinois tourism and increase revenues available to the State. 230 ILCS 10/2(a) (West 2012). This intent can be accomplished, the statute continues, "only if public confidence and trust in the credibility and integrity of the gambling operations and the regulatory process is maintained." 230 ILCS 10/2(b) (West 2012). The regulatory provisions of the

Riverboat Gambling Act (applicable to the Video Gaming Act) "are designed to *strictly regulate* the facilities, persons, associations and practices related to gambling operations pursuant to the police powers of the State, including comprehensive law enforcement supervision." (Emphasis added.) *Id.*

¶ 50     Section 5 of the Riverboat Gambling Act grants the Gaming Board "all other powers necessary and proper to fully and effectively execute this Act for the purpose of administering, regulating, and enforcing the system of riverboat gambling established by this Act." 230 ILCS 10/5(a)(1) (West 2012). Section 5 also provides that the Gaming Board's "jurisdiction shall extend under this Act to every person, association, corporation, partnership and trust involved in riverboat gambling operations in the State of Illinois." *Id.* Because these provisions do not conflict with the Act, we believe that the legislature intended that this grant of "all other powers" and "jurisdiction" to the Gaming Board applies equally to the video gaming operations in Illinois under the Act. Therefore, the Gaming Board's "jurisdiction shall extend *** to every person, association, corporation, partnership and trust involved in [video gaming] operations in the State of Illinois." 230 ILCS 10/5(a)(1) (West 2012).

¶ 51     Section 5 of the Illinois Riverboat Gambling Act also outlines the duties and responsibilities of the Gaming Board, which include the "administration and enforcement of the Video Gaming Act." 230 ILCS 10/5(b)(13) (West 2012). The Gaming Board "shall have jurisdiction over and shall supervise all gambling operations governed by" the Riverboat Gambling Act. 230 ILCS 10/5(c) (West 2012). The Gaming Board has the authority "[t]o conduct hearings, issue subpoenas for the attendance of witnesses and

23

subpoenas duces tecum for the production of books, records and other pertinent documents in accordance with the Illinois Administrative Procedure Act, and to administer oaths and affirmations to the witnesses, when, in the judgment of the Board, it is necessary to administer or enforce [the Riverboat Gambling Act] or the Board rules." 230 ILCS 10/5(c)(9) (West 2012). The Gaming Board may "take any other action as may be reasonable or appropriate to enforce" the Riverboat Gambling Act and rules and regulations under the statute. 230 ILCS 10/5(c)(21) (West 2012).

¶ 52    Section 17 of the Riverboat Gambling Act states that the "Illinois Administrative Procedure Act shall apply to all administrative rules and procedures of the Board under *** the Video Gaming Act." 230 ILCS 10/17 (West 2012). Finally, section 17.1 of the Riverboat Gambling Act states that jurisdiction and venue for the judicial review of a final order of the Gaming Board relating to "owners, suppliers or special event licenses is vested in the Appellate Court of the judicial district in which Sangamon County is located." 230 ILCS 10/17.1(a) (West 2012). "Judicial review of all other final orders of the Board shall be conducted in accordance with the Administrative Review Law." 230 ILCS 10/17.1(b) (West 2012).

¶ 53    Read as a whole, this statutory scheme, which encompasses the provisions of the Riverboat Gambling Act, evidences the legislature's explicit intent that the Gaming Board have exclusive power over the gaming industry in order to preserve the integrity of legalized gambling in this State. The legislature intended that video gaming would be conducted in Illinois only under the supervision of and authority granted by the Gaming Board because a lack of public confidence in video gaming would undermine the

24

legislative purpose of legalized gambling, which includes promoting Illinois tourism and increasing revenues available to the State.

¶ 54    Agreements and assignments that potentially allow unlicensed entities to receive compensation directly linked to the placement and operation of video gaming terminals can directly impact the public's interest in the video gaming industry. "[T]he authority to determine public interest is vested in the legislature and cannot permissibly be delegated to the judiciary." *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462, 478-79, 645 N.E.2d 946, 954 (1994). We believe that the Act, therefore, confers authority to the Gaming Board, not the circuit court, to resolve the controversy in the present case. The controversy falls within the Gaming Board's "jurisdiction and supervision over all video gaming operations in this State and all persons in establishments where video gaming operations are conducted." 230 ILCS 40/78(a)(2) (West 2012). Because resolution of the present case will have a significant impact on who profits from the legalization of video gaming in Illinois, this court believes that the Gaming Board must address the controversy.

¶ 55    J&J Ventures Gaming and Action Gaming argue that we should follow the court's decision in *Triple 7*, 2013 IL App (3d) 120860, 992 N.E.2d 1251. We decline to follow *Triple 7* because we believe *Triple 7* was wrongly decided; we believe that the court lacked jurisdiction to decide the merits of that case.

¶ 56    In *Triple 7*, the owner of an establishment called Da Lee's Fine Dining signed an agreement with Metro Amusements, which provided Metro the exclusive right to place video gaming terminals in Da Lee's establishment. *Triple 7*, 2013 IL App (3d) 120860,

25

¶ 2, 992 N.E.2d 1251. At that time, Metro was not a licensed terminal operator under the Act. *Id.* Subsequently, Metro entered into an asset purchase agreement with Best Gaming in which Best Gaming acquired most of Metro's assets, including the contract with Da Lee's. *Id.* ¶ 3. At that time, Best had applied to be a licensed terminal operator, but the Gaming Board had not granted it a license. It later denied the request, and Best requested a hearing. *Id.* ¶ 4. In the meantime, it assigned the contract with Da Lee's to GEM, which was a licensed terminal operator; the Gaming Board subsequently denied Best's request for a hearing. *Id.*

¶ 57　Sometime after Best's assignment to GEM, Triple 7 entered into a contract with Da Lee's that provided that it would have the exclusive right to place and service video gaming terminals at Da Lee's establishment. *Id.* ¶ 5. A dispute arose between Triple 7 and GEM concerning which entity had a valid contract with Da Lee's, and Triple 7 filed a complaint for a declaratory judgment. *Id.* ¶ 7. The circuit court dismissed Triple 7's complaint, holding that "the agreement between Da Lee's and Metro was not a use agreement and therefore did not violate the Act or the video gaming regulations." *Id.* ¶ 8. Triple 7 appealed. On appeal, the *Triple 7* court did not analyze its jurisdiction over the controversy. It affirmed the circuit court on the merits of the lower court's decision.

¶ 58　In deciding the controversy, the *Triple 7* court stated that the Gaming Board's regulations require use agreements to be between a licensed terminal operator and a licensed video gaming location. Accordingly, the court concluded that the contract at issue could not be a use agreement because neither Da Lee's nor Metro was licensed when it entered into the original agreement. *Id.* ¶ 17. The *Triple 7* court stated,

26

"[t]herefore, the rules and regulations prohibiting the assignment of a use agreement do not apply to the agreement assigned to GEM." *Id.* In addition, the *Triple 7* court rejected an argument that sections 1800.110 and 1800.320 of the Gaming Board's rules prohibit prelicensure agreements. Accordingly the court's ruling validated a practice of assigning precursor agreements, purporting to control the placement of video gaming terminals, between unlicensed individuals and entities "until the terminal operator becomes licensed under the Act." *Id.* ¶ 23. At that point, according to the *Triple 7* court, the agreement may not be assigned "except to another licensed terminal operator." *Id.*

¶ 59 In the present case, the circuit court was required to follow the *Triple 7* court's reasoning, which resulted in a holding that the original exclusive location agreement was not a use agreement under the Act for a period of time and was capable of being freely traded and exchanged between unlicensed entities for profit. The exclusive location agreement then transitioned into a use agreement once it was finally passed into the hands of a licensed entity and, at that time, controlled the placement of video gaming terminals in Wild Country's licensed establishment and served as a basis for further compensation directly tied to video gaming operations to be transferred to unlicensed entities.

¶ 60 We believe that the highly regulated nature of the statutory scheme making video gaming legal in Illinois evidences a legislative intent that the Gaming Board have exclusive authority over the issues decided by the circuit court in the present case and by the appellate court in *Triple 7*. The legislature intended for the Gaming Board to determine the requirements and limitations for use agreements so that it may preserve the integrity of the video gaming industry. Nothing in the statutory scheme evidences a

27

legislative intent that the courts should have concurrent jurisdiction to regulate use agreements or precursor agreements that would later purport to control the placement and operation of video gaming terminals. We believe the *Triple 7* court usurped the Gaming Board's authority and decided issues that were within the Gaming Board's exclusive authority to decide. Accordingly, we decline to follow *Triple 7*.

¶ 61 Furthermore, we believe that the legislature intended for the Gaming Board to have exclusive authority over agreements affecting the placement and operation of video gaming terminals because there is an obvious need for uniform application of the gaming laws throughout the State. Allowing the parties in disputes over the placement of video gaming terminals to seek circuit court intervention has the potential of disrupting the Act's statutory scheme. There are multiple lawsuits in this court's district involving the enforcement of agreements similar to the agreements at issue in the present case and in *Triple 7*.[1] It is likely that similar lawsuits are pending throughout the State. This case was consolidated for oral argument with nine different lawsuits from three different counties. In each case, Accel Entertainment asks us to reject the *Triple 7* decision and hold that the assignment of the agreement from Action Gaming to J&J Ventures Gaming

---

[1]The record on appeal includes a motion that Accel Entertainment filed with the supreme court, pursuant to Illinois Supreme Court Rule 384 (eff. Nov. 1, 1990), in which it sought to consolidate 28 cases (including the present case) that are or were pending in 10 different counties and that involved similar disputes over the placement of video gaming terminals in various establishments. The supreme court denied the motion.

was invalid. This would result in conflicting appellate court rulings. Therefore, we believe that the legislature's grant of exclusive authority to the Gaming Board furthers its intent that the rules of this newly created and strictly regulated industry be applied uniformly.

¶ 62    Both parties have argued that the Gaming Board has *no* authority over the validity of the agreements at issue in the present case. We disagree. J&J Ventures Gaming claims to have the exclusive right to place and operate video gaming terminals as a result of the original exclusive location agreement and subsequent assignments. J&J Ventures Gaming is correct only if the agreements constitute a valid use agreement under the Act. There is no question that the Gaming Board has authority to promulgate rules related to and exercise jurisdiction over use agreements. It has already done so by enacting rules pertaining to the minimum standards for use agreements in section 1800.320. We believe its authority over use agreements is exclusive and that this authority, by necessity, includes jurisdiction over the exclusive location agreement and assignments at issue in the present case. The validity of any agreement that controls the placement of video gaming terminals rests exclusively within the Gaming Board's authority. Its decision is reviewable under the standards of the Administrative Review Law.

¶ 63    In their brief, J&J Ventures Gaming and Action Gaming argue that the Gaming Board "has acknowledged that it lacks jurisdiction and power to decide the enforceability of pre-licensure agreements." It cites to statements made by an attorney of the Gaming Board in a correspondence dated September 11, 2013. In the letter, the attorney states that the Gaming Board has consistently said that a contract entered into by two

29

unlicensed parties could not be considered a use agreement pursuant to the rules adopted by the Gaming Board and that the Gaming Board is not concerned with whether or not such an agreement is valid or enforceable under contract law. The attorney further stated that "[w]hether or not that contract can become a valid Use Agreement pursuant to the Adopted Rules of the Illinois Gaming Board is an issue that is decided once the parties to the contract are licensed by the Illinois Gaming Board."

¶ 64    This correspondence does not control our analysis. "Determining the scope of any agency's power and authority is a judicial function, rather than a question for the agency to answer itself." *Gallaher v. Hasbrouk*, 2013 IL App (1st) 122969, ¶ 19, 3 N.E.3d 913. The validity of the agreements at issue falls within the Gaming Board's authority because J&J Ventures Gaming maintains that it has the exclusive right to place and operate video gaming terminals within Wild Country's establishment as a result of the agreements. Whether the agreements collectively constitute a valid use agreement under the Act is a matter for the Gaming Board to decide. The agreements' purported conveyance of video-gaming-linked monetary compensation to unlicensed entities also brings the validity of the agreements under the exclusive authority of the Gaming Board.

¶ 65    In their cross-appeal, J&J Ventures Gaming and Action Gaming argue that the circuit court erred in allowing Accel Entertainment to intervene permissively. Section 2-408(a) of the Code of Civil Procedure (735 ILCS 5/2-408(a)(2) (West 2012)) allows a person or entity to intervene in an action "when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action." The issue of whether the circuit court

30

erred in granting Accel Entertainment's petition to intervene is moot in light of our determination that the Gaming Board has exclusive jurisdiction over the merits of the controversy.

¶ 66   Finally, J&J Ventures Gaming and Action Gaming have filed a motion to dismiss Accel Entertainment's appeal, arguing that it lacks standing and is not a proper intervenor. For the reasons stated above, this motion is denied as moot.

¶ 67                              CONCLUSION

¶ 68   For the foregoing reasons, we vacate the circuit court's judgment and dismiss this appeal.


¶ 69    Judgment vacated; motion denied; appeal dismissed.

2015 IL App (5th) 140092

NO. 5-14-0092

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| J&J VENTURES GAMING, LLC, an Illinois Limited Liability Company, and ACTION GAMING, LLC, an Illinois Limited Liability Company, | ) ) ) ) | Appeal from the Circuit Court of Madison County. |
| Plaintiffs-Appellees and Cross-Appellants, | ) ) | |
| v. | ) ) | No. 13-MR-85 |
| WILD, INC., d/b/a Wild Country, an Illinois Corporation, | ) ) ) | |
| Defendant | ) ) | |
| (Accel Entertainment Gaming, LLC, Intervenor-Appellant and Cross-Appellee). | ) ) ) | Honorable Donald M. Flack, Judge, presiding. |

_____

**Opinion Filed:**         August 7, 2015

_____

**Justices:**         Honorable Bruce D. Stewart,  J.

                Honorable Richard P. Goldenhersh, J., and
                Honorable S. Gene Schwarm, J.,
                Concur

_____

**Attorneys for Appellant**         Steven P. Blonder, Marissa L. Downs, Much Shelist, P.C., 191 North Wacker Drive, Suite 1800, Chicago, IL 60606; Patricia S. Murphy, G. Patrick Murphy, Murphy & Murphy LLC, 3415 Office Park Drive, Suite D, Marion, IL 62959

_____

**Attorneys for Appellees**         Christopher A. Koester, Aaron C. Jones, Taylor Law Offices, P.C., 122 East Washington Avenue, P.O. Box 668, Effingham, IL 62401 (attorneys for J&J Ventures Gaming, LLC); Corey M. Shapiro, William M. Gantz, Irina Dashevsky, Dentons US LLP, 233 South Wacker Drive, Suite 7800, Chicago, IL 60606, Paul P. Waller, III, Walker & Williams, P.C., 4343 West Main Street, Belleville, IL 62226 (attorneys for Action Gaming, LLC)

_____