NOTICE
Decision filed 11/13/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230255

NO. 5-23-0255

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| J&J VENTURES GAMING, LLC, an Illinois Limited Liability Company; ACTION GAMING LLC, an Illinois Limited Liability Company; and ILLINOIS GAMING INVESTMENTS, LLC, an Illinois Limited Liability Company, | ) ) ) ) ) | Appeal from the Circuit Court of Marion County. |
| | ) | |
| Plaintiffs-Appellants, | ) ) | |
| | ) | |
| v. | ) ) | No. 21-MR-88 |
| | ) | |
| THE ILLINOIS GAMING BOARD, an Administrative Agency in the State of Illinois; ACCEL ENTERTAINMENT GAMING, LLC; A.C. PITSTOP, INC.; DENNIS PETERSON, d/b/a Caddyshack; WHITLOCK CHIEFS, INC., d/b/a Chiefs II; CHOPS FAMILY INN, INC., d/b/a Chops Family Inn, f/k/a TJ's Tavern II Inc.; CHOPS FAMILY INN II, f/k/a Big Al's Place; CENTRALIA LODGE #493, d/b/a Elk's - Centralia BPOE #493; INDUSTRIAL TAVERN INC.; KING TUT'S LLC, n/k/a I Khodal, LLC; PROGRESSIVE CLUB, INC.; TOM BISHOP, d/b/a Rank and File Lounge; SKIPPER INN, INC.; DARLA P. RUSHING, d/b/a Rush Inn 2 Jolly's; VERNOIS POST NO. 1376; VETERANS OF FOREIGN WARS OF U.S., d/b/a VFW Post 1376-Mt. Vernon; DuQUOIN POST #513; VETERANS OF FOREIGN WARS OF U.S., d/b/a VFW Post 513-DuQUOIN; JOHN M. SCHIEPPE, d/b/a Schiappa's-Lebanon; FOE, AERIE #2791, INC., d/b/a Fraternal Order of Eagles 2791; and TED MILLER, d/b/a Ted E. Bear's Club, Inc., n/k/a Lil Bit's Saloon, Inc., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Mark W. Stedelin, |

Defendants-Appellees.                    )          Judge, presiding.

JUSTICE CATES delivered the judgment of the court, with opinion.
Presiding Justice Vaughan and Justice Welch concurred in the judgment and opinion.

**OPINION**

¶ 1      The plaintiffs, J&J Ventures Gaming, LLC (J&J Ventures), Action Gaming, LLC (Action Gaming), and Illinois Gaming Investments, LLC (Illinois Gaming), petitioned the Illinois Gaming Board (Gaming Board) for a determination that the plaintiffs' exclusive location agreements with the defendant gaming establishments (hereinafter Contested Locations)[1] were valid and enforceable agreements to place video gaming terminals within the Contested Locations and that their agreements predated and had priority over similar agreements between the defendant, Accel Entertainment Gaming LLC (Accel), and the Contested Locations. The Gaming Board denied the plaintiffs' petition, and the circuit court of Marion County affirmed that decision. On appeal, the plaintiffs claim the Gaming Board went beyond the scope of its authority and misapplied contract law in its analysis of the plaintiffs' petition to determine the validity and the enforceability of the competing exclusive location agreements and that the Gaming Board's rules governing such

---

[1]Defendants, A.C. Pitstop, Inc.; Dennis Peterson, doing business as Caddyshack; Whitlock Chiefs, Inc., doing business as Chiefs II; Chops Family Inn, Inc., doing business as Chops Family Inn (formerly known as TJ's Tavern II Inc.); Chops Family Inn II (formerly known as Big Al's Place), Centralia Lodge #493, doing business as Elk's-Centralia BPOE #493; Industrial Tavern, Inc.; King Tut's LLC (now known as I Khodal, LLC); Progressive Club, Inc.; Tom Bishop, doing business as Rank and File Lounge; Skipper Inn, Inc.; Darla P. Rushing, doing business as Rush Inn 2 Jolly's; Vernois Post No. 1376; Veterans of Foreign Wars of U.S., doing business as VFW Post 1376-Mt. Vernon; DuQuoin Post # 513; Veterans of Foreign Wars of U.S., doing business as VFW Post 513-DuQuoin; John M. Schieppe, doing business as Schiappa's-Lebanon; FOE, Aerie #2791, Inc., doing business as Fraternal Order of Eagles 2791; and Ted Miller, doing business as Ted E. Bear's Club, Inc. (now known as Lil Bit's Saloon, Inc.), were collectively referred to as the "Contested Locations" in the pleadings before the circuit court and that reference is retained in this disposition for consistency. These establishments operated bars, lounges, and veterans or fraternal establishments.

petitions violated their rights to procedural due process. For the following reasons, we affirm the decision of the Gaming Board.

¶ 2                                                    I. BACKGROUND

¶ 3      This case involves a decade-long dispute between entities who have competing exclusive location agreements for the placement and operation of video gaming terminals within the Contested Locations. The litigation history has been documented in prior appeals to this court (*J&J Ventures Gaming, LLC v. Wild, Inc.*, 2015 IL App (5th) 140092) and the Illinois Supreme Court (*J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870) and will not be recounted in its entirety. An overview of the factual and procedural history pertinent to the issues in this appeal follows.

¶ 4      In July 2009, the Illinois legislature enacted the Video Gaming Act (Gaming Act) (230 ILCS 40/1 *et seq.* (West 2010)), and thereby legalized the use of video gaming terminals as a form of commercial gambling within certain licensed entities, such as bars, veterans organizations, and fraternal organizations. See *J&J Ventures*, 2016 IL 119870, ¶ 3. In enacting the law, the legislature created "a comprehensive statutory scheme, creating rights and duties that have no counterpart in common law or equity." *J&J Ventures*, 2016 IL 119870, ¶ 32.

¶ 5      In enacting the Gaming Act, the legislature granted the Gaming Board exclusive authority to supervise all video gaming operations governed by the Gaming Act and all powers necessary to fully and effectively execute its provisions. 230 ILCS 40/78 (West 2016); *J&J Ventures*, 2016 IL 119870, ¶ 27. The Gaming Board's authority includes the power to investigate applicants, to determine the eligibility of applicants for licenses, to select those applicants who best serve the interests of Illinois residents, and to determine the validity and enforceability of use agreements. 230 ILCS 40/78(a) (West 2016). The Gaming Board's authority also includes the power to adopt

3

rules and regulations for the purposes of administering the Gaming Act, preventing "practices detrimental to the public interest," and providing for "the best interests of video gaming." 230 ILCS 40/78(a)(3) (West 2016); *J&J Ventures*, 2016 IL 119870, ¶ 28. Pursuant to its authority, the Gaming Board adopted emergency regulations to administer the Gaming Act in 2009 (33 Ill. Reg. 14793 (eff. Oct. 19, 2009)), codified under Title 11, part 1800, of the Illinois Administrative Code (11 Ill. Adm. Code 1800). The Gaming Board adopted a complete set of regulations in 2010 (34 Ill. Reg. 2893 (eff. Feb. 22, 2010)).[2] Following a three-year period of preparation, video gaming operations commenced in Illinois in October 2012. *J&J Ventures*, 2016 IL 119870, ¶ 3.

¶ 6    Under the Gaming Act, all video gaming terminal operators and all video gaming establishments must be licensed by the Gaming Board. 230 ILCS 40/25(c), (e) (West 2016). The Gaming Act specifically provides, "No video gaming terminal may be placed in any licensed establishment *** unless the owner or agent of the owner of the licensed establishment *** has entered into a written use agreement with the terminal operator for placement of the terminals."[3] 230 ILCS 40/25(e) (West 2016). Pursuant to its authority, the Gaming Board established minimum standards for use agreements. See 11 Ill. Adm. Code 1800.320(a), amended at 38 Ill. Reg. 14275 (eff. June 30, 2014). Under the Gaming Board's definitions, a " '[u]se agreement' " is

---

[2]Since 2010, the Gaming Board's regulations have been amended periodically to address arising issues in the video gaming industry.

[3]Definitions for many of the specific terms used in the video gaming industry are included in the Gaming Act (230 ILCS 40/5 (West 2016)), and in Title 11 of the Illinois Administrative Code (11 Ill. Adm. Code 1800.110, amended at 40 Ill. Reg. 8760 (eff. June 14, 2016)). " 'Video gaming terminal' " is defined as "any electronic video game machine that, upon insertion of cash ***, is available to play or simulate the play of a video game, *** in which the player may receive free games or credits that can be redeemed for cash." 230 ILCS 40/5 (West 2016). " 'Terminal operator' " is defined as "an individual, partnership, corporation, or limited liability company that is licensed under this Act and that owns, services, and maintains video gaming terminals for placement in licensed establishments." 230 ILCS 40/5 (West 2016). " 'Licensed establishment' " is defined as "any licensed retail establishment where alcoholic liquor is drawn, poured, mixed, or otherwise served for consumption on the premises, whether the establishment operates on a nonprofit or for-profit basis." 230 ILCS 40/5 (West 2016).

4

"[a] contractual agreement between a licensed terminal operator and a licensed video gaming location establishing terms and conditions for placement and operation of video gaming terminals by the licensed terminal operator within the premises of the licensed video gaming location, and complying with all of the minimum standards for use agreements contained in Section 1800.320." 11 Ill. Adm. Code 1800.110, amended at 40 Ill. Reg. 8760 (eff. June 14, 2016).

¶ 7    Shortly after the effective date of the Gaming Act, and prior to the implementation of the Gaming Board's emergency regulations, Action Amusement Company, an unlicensed terminal operator and a nonparty to this litigation, entered into an "Exclusive Location and Video Gaming Terminal Agreement" (exclusive location agreement) with each of the Contested Locations. Under the exclusive location agreements, Action Amusement Company had the exclusive right to place and operate video gaming terminals within the Contested Locations. In October 2010, Action Amusement Company assigned its rights under the exclusive location agreements to plaintiff Action Gaming, who was also unlicensed. Subsequently, Action Gaming applied for a terminal operator's license.

¶ 8    In July 2012, the Gaming Board notified Action Gaming that its application for a terminal operator's license had been preliminarily denied. The Gaming Board found that Action Gaming failed to meet the requirements of the Gaming Act because certain employees and owners of Action Gaming had been personally and professionally associated with people who had been convicted of illegal gambling or other felony offenses. Action Gaming requested a hearing before the Gaming Board regarding the denial of its license application.

¶ 9    On August 24, 2012, while its hearing request was pending, Action Gaming and J&J Ventures entered into an asset purchase agreement. According to the terms of the agreement,

5

Action Gaming agreed to assign its interests under the exclusive location agreements to J&J Ventures, a licensed terminal operator,[4] and J&J Ventures agreed to compensate Action Gaming based upon the number of Contested Locations that hosted a J&J Ventures video gaming terminal. Meanwhile, in late August and early September 2012, each of the Contested Locations entered into new agreements with defendant Accel. At the time those agreements were entered into, Accel had a valid terminal operator's license.[5] Under the terms of the agreements, Accel was given the exclusive right to place and operate video gaming terminals in each of the Contested Locations. Subsequently, Accel began operating video gaming terminals in the Contested Locations.

¶ 10    Thereafter, J&J Ventures and Action Gaming filed several declaratory judgment actions against the Contested Locations in Illinois circuit courts. J&J Ventures and Action Gaming sought judgments declaring that they had the exclusive right to place and operate video gaming terminals within the Contested Locations until the expiration of their exclusive location agreements. Ultimately, the cases reached the Illinois Supreme Court. The supreme court reviewed the terms of the subject agreements and noted that the agreements require each party to obtain the requisite license and that "the agreements specifically provide that they take effect when the first video gaming terminal first operates in the licensed establishment—a circumstance that cannot occur unless and until the parties are licensed and the Board has approved the agreements." *J&J Ventures*, 2016 IL 119870, ¶ 38. The supreme court held that the Gaming Board had the exclusive authority to determine the validity and the enforceability of the parties' competing agreements because the agreements purported to control the placement and operation of video gaming

---

[4]J&J Ventures' application for licensure as a terminal operator was approved on January 19, 2012.
[5]Accel's application for licensure as a terminal operator was approved on March 15, 2012.

6

terminals within licensed establishments and affirmed the dismissal of the declaratory judgment actions for lack of subject matter jurisdiction. *J&J Ventures*, 2016 IL 119870, ¶¶ 38, 42.

¶ 11 On June 9, 2017, J&J Ventures filed a petition with the Gaming Board pursuant to section 1800.320(b) of the Illinois Administrative Code (11 Ill. Adm. Code 1800.320(b), amended at 38 Ill. Reg. 14275 (eff. June 30, 2014)). Therein, J&J Ventures sought a declaration (a) that the agreements it had acquired from Action Gaming were valid and enforceable and (b) that the subsequent agreements between Accel and the Contested Locations were invalid and unenforceable. J&J Ventures also asked the Gaming Board to order Accel to remove all video gaming terminals from the Contested Locations and to declare that the parties may pursue lawsuits regarding issues other than the validity and the enforceability of the competing exclusive location agreements. In its petition, J&J Ventures claimed that its exclusive location agreements were "first-in-time" and, therefore, had priority over Accel's agreements. Action Gaming was granted leave to intervene and made arguments similar to those advanced by J&J Ventures.

¶ 12 On July 20, 2017, Accel filed a response to J&J Ventures' petition. Accel claimed that J&J Ventures did not have a superior right to place and operate video gaming machines in the Contested Locations. Accel also challenged Action Gaming's assignment to J&J Ventures. Accel pointed to the Gaming Board's prior finding that Action Gaming was unsuitable for licensure and argued Action Gaming could not have a financial interest in or profit from an Illinois gaming contract.

¶ 13 On December 15, 2020, the administrator of the Gaming Board issued a recommended decision to deny the plaintiffs' petition. Citing to *J&J Ventures*, 2016 IL 119870, ¶ 26, the administrator noted that there is "no common law right in Illinois to engage in or profit from gambling" through contract or otherwise, and consequently, that video gaming contracts that do not conform to the applicable regulatory requirements are considered illegal gambling contracts

7

and void. The administrator further noted that the Gaming Act and the rules of Gaming Board required video gaming terminal operators and establishments to be licensed. The administrator found that the Gaming Board would not recognize the validity and enforceability of an agreement between a terminal operator and an establishment until both entities were licensed and "any additional conditions parties to an agreement have imposed upon themselves materialize." Next, the administrator referred to the exclusive location agreements at issue and found that all agreements contained a similar, if not identical section titled, "Term of Agreement." The "Term of Agreement" provided that the agreement's initial term would "commence upon the date the first video terminal described herein first operates in the Licensed Establishment." The administrator found that the agreements contained express conditions precedent to the enforceability of the agreements requiring licensure of the Contested Locations and the operation of video gaming terminals within those Contested Locations. The administrator also found that Accel was licensed at the time it executed its agreements with the Contested Locations and that the Contested Locations subsequently obtained licenses and thereafter permitted Accel to place and operate video gaming terminals within their establishments. Thus, the administrator concluded that the Contested Locations effectively withdrew from the agreements assigned to J&J Ventures. The administrator determined that Accel was the licensed terminal operator who first placed and operated video gaming terminals within licensed establishments; that Accel satisfied the necessary contingencies under the agreements and the rules of the Gaming Board; and that there was no basis upon which to order Accel to remove its machines from the Contested Locations "absent any evidence of fraud, duress, or other misconduct." The administrator recommended that the Gaming Board deny all relief requested by J&J Ventures, except the request for a declaration that a lawsuit may proceed

in the circuit court to determine any issue other than the validity and the enforceability of the disputed video gaming terminal agreements.

¶ 14   On December 29, 2020, J&J Ventures filed exceptions to the administrator's recommended decision. J&J Ventures argued that under Illinois law, its "first-in-time" exclusive location agreements had priority over Accel's "second-in-time" agreements. J&J Ventures also alleged, for the first time, that Accel and/or its agent, Jason Rowell, engaged in "purported fraud" to obtain the exclusive location agreements with the Contested Locations. On April 21, 2021, the Gaming Board issued its final order. Therein, the Gaming Board recognized that the legislature had enacted a comprehensive statutory scheme that created rights and duties that had no counterpart in common law or equity, citing to the Illinois Supreme Court's decision in *J&J Ventures*, 2016 IL 119870, ¶ 26. The Gaming Board noted that contrary to the petitioners' arguments, "the jurisprudence of contract law is not binding in this matter." The Gaming Board further noted that without a counterpart in common law or equity, "contract law serves as guidance" in resolving the pending dispute. After careful review and consideration of the entire record, the Gaming Board adopted the recommended decision of the administrator and determined that J&J Ventures did not prove the allegations in its petition by clear and convincing evidence. The Board denied the requested relief but issued a declaration that the parties may proceed with various civil lawsuits involving any issues "other than the enforceability and validity of the disputed video gaming terminal agreements" in a manner consistent with the supreme court's holding in *J&J Ventures*, 2016 IL 119870.

¶ 15   On May 21, 2021, the plaintiffs filed a complaint for administrative review in the circuit court of Marion County. In the first amended complaint, the plaintiffs alleged that the Gaming Board's final order included an analysis and a conclusion that went beyond the Gaming Board's

9

authority under the Gaming Act or the holding in *J&J Ventures*. The plaintiffs also alleged that the Gaming Board misapplied contract law and failed to properly analyze the exclusive location agreements in accordance with the provisions of section 1800.320, of Title 11, of the Illinois Administrative Code and that the Gaming Board's procedures for reviewing exclusive location agreements violated their rights to procedural due process. The plaintiffs requested a stay of enforcement of the Gaming Board's final order pending a ruling on the merits of the complaint, an order reversing the Gaming Board's final order in its entirety, and an award of costs and attorney fees. On March 23, 2023, the circuit court affirmed the final order of the Gaming Board. This appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, the plaintiffs claim the Gaming Board's decision to validate and enforce Accel's "second-in-time" exclusive location agreements rather than J&J Ventures' "first-in-time" agreements was reversible error. Judicial review of the Gaming Board's decision is governed by the Administrative Review Law (735 ILCS 5/3-102 (West 2016)). See 230 ILCS 10/17.1(b) (West 2016). In administrative review cases, the appellate court reviews the decision of the administrative agency, not the decision of the circuit court. *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 28; *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law. *Medponics Illinois*, 2021 IL 125443, ¶ 29; *AFM Messenger Service*, 198 Ill. 2d at 390.

¶ 18    An administrative agency's factual findings are deemed to be *prima facie* correct and will only be reversed if they are against the manifest weight of the evidence. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006) (*per curiam*). An administrative

10

agency's determination of questions of law are reviewed *de novo*. A*FM Messenger Service*, 198 Ill. 2d at 390. A mixed question of fact and law involves an examination of the legal effect of a given set of facts. *AFM Messenger Service*, 198 Ill. 2d at 391. An agency's determination of a mixed question of fact and law is reviewed under the clearly erroneous standard. *Medponics Illinois*, 2021 IL 125443, ¶ 29; *AFM Messenger Service*, 198 Ill. 2d at 391. Under the clearly erroneous standard, the agency's decision may only be reversed if the reviewing court is left with the definite and firm conviction that a mistake has been made. *AFM Messenger Service*, 198 Ill. 2d at 395.

¶ 19     Administrative regulations have the force and effect of law and are interpreted with the same standards that govern the construction of statutes. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380 (2008). Administrative agencies have wide latitude in adopting regulations reasonably necessary to carry out the agency's statutory duty, and those regulations are presumptively valid. See generally *Medponics Illinois*, 2021 IL 125443, ¶ 31; *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 38. Furthermore, the agency's interpretation of its own regulations is entitled to substantial deference and weight because the agency makes informed judgments based upon its own expertise and experience and acts as a knowledgeable source in ascertaining the intent of the legislature. *Medponics Illinois*, 2021 IL 125443, ¶ 31.

¶ 20     Initially, the plaintiffs' claim that the Gaming Board went beyond the scope of the authority granted under the Gaming Act and the supreme court's holding in *J&J Ventures* in analyzing and ruling on their petitions to determine the validity and the enforceability of the competing exclusive location agreements at issue. We disagree.

¶ 21     In this case, the plaintiffs petitioned the Gaming Board to find that their exclusive location agreements with the Contested Locations predated and had priority over similar agreements

11

between defendant Accel and the Contested Locations. As noted earlier, the Gaming Board was vested with authority and supervision over all video gaming operations governed by the Gaming Act and granted "all powers necessary and proper to fully and effectively execute" the provisions of the Gaming Act. See 230 ILCS 40/78(a) (West 2016); *J&J Ventures*, 2016 IL 119870, ¶ 27. The Gaming Act's comprehensive statutory scheme revealed "the legislature's explicit intent that the Gaming Board have exclusive jurisdiction over the video gaming industry and the use agreements that are a necessary prerequisite of engaging in that industry." *J&J Ventures*, 2016 IL 119870, ¶ 32. Section 78(a)(1) of the Gaming Act expressly authorizes the Gaming Board to investigate and determine an applicant's eligibility for licensure and "to select among competing applicants [those who] best serve the interests of the citizens of Illinois." 230 ILCS 40/78(a)(1) (West 2016); *J&J Ventures*, 2016 IL 119870, ¶ 27. Accordingly, the Gaming Board had the authority to determine the validity and the enforceability of the competing exclusive location agreements at issue in this case. See *J&J Ventures*, 2016 IL 119870, ¶¶ 38, 42.

¶ 22    It is important to recognize that the Gaming Board's authority to make decisions about the validity and the enforceability of the exclusive location agreements at issue does not depend upon the correctness of the Gaming Board's decision. *One Way Liquors, Inc. v. Byrne*, 105 Ill. App. 3d 856, 861 (1982). When an administrative agency acts within the scope of its conferred authority, the agency's authority carries with it the authority to make incorrect decisions as well as correct decisions. *One Way Liquors, Inc.*, 105 Ill. App. 3d at 861. In this case, we do not find that the Gaming Board exceeded its authority under the Gaming Act or the *J&J Ventures* decision in analyzing and deciding the matters presented in the plaintiffs' petitions.

¶ 23    The plaintiffs also claim that the Gaming Board's decision to deny their petitions to enforce the exclusive location agreements was based on an erroneous finding that J&J Ventures failed to

12

complete a condition precedent to enforcement. The plaintiffs contend that the Gaming Board improperly construed the "term provision" in the exclusive location agreements and erroneously concluded that the placement and operation of video gaming terminals within the Contested Locations was a condition precedent to finding that the agreements were valid and enforceable.

¶ 24    Each of the exclusive location agreements at issue contains a preamble section titled "Recitals" that set forth the intentions of the contract. Therein, the parties stated the intent to obtain the necessary licenses required under the Gaming Act and "the wish to enter the agreement for the purpose of placing and operating video gaming terminals in the Licensed Establishment." Each of the exclusive locations agreements at issue also contains a section titled "Term of Agreement." This section provides that the initial term of the agreement "will commence upon the date the first video gaming terminal described herein first operates in the Licensed Establishment." See *J&J Ventures*, 2016 IL 119870, ¶ 38 (in considering whether the agreements at issue fell within the purview of the Gaming Board, our supreme court noted that the subject agreements required each party to obtain the "requisite license" and "specifically provide[d] that they take effect when the first video gaming terminal first operate[d] in the licensed establishment").

¶ 25    In the recommended decision, the administrator considered the submissions of the parties in light of the provisions in the Gaming Act, the pertinent rules of the Gaming Board, and the supreme court's decision in *J&J Ventures*, 2016 IL 119870, ¶ 38. The administrator found that Accel, a licensed terminal operator, placed and first operated the first video gaming terminals within Contested Locations who were also licensed. The administrator concluded that Accel met the agreed requirements for the placement and operation of video gaming terminals within the Contested Locations and that J&J Ventures did not. In adopting the administrator's recommended decision, the Gaming Board determined that Accel's exclusive location agreements were valid and

13

enforceable and that those agreements would be given priority over the competing location agreements assigned to J&J Ventures. This was an appropriate exercise of the Gaming Board's discretion and its authority under the Gaming Act. 11 Ill. Adm. Code 1800.320(b)(1)(B), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). Acting within the scope of its authority and consistent with the intent of the Gaming Act, the Gaming Board could have reasonably concluded that Accel would best serve the interests of the citizens of Illinois by spurring economic development, promoting tourism, and increasing State revenues. See 230 ILCS 10/2 (West 2016); 230 ILCS 40/78(a)(1) (West 2016).

¶ 26    In sum, the Gaming Board carefully considered the entire record and concluded that the plaintiffs failed to establish that their exclusive location agreements should be given priority under the circumstances presented. The Gaming Board acted within its discretion, and its decision was based upon its experience within the gambling and video gaming industries. After reviewing the record, we do not find that the decision of the Gaming Board was clearly erroneous.

¶ 27    In their respective briefings, the parties noted that after the final order was issued in this case, the Gaming Board amended its rules to address situations similar to those presented here. See 11 Ill. Adm. Code 1800.320(a)(2) (2022); see also 46 Ill. Reg. 17107 (eff. Sept. 28, 2022). None of the parties argued that the amendment applied retroactively to this dispute. Accordingly, that issue is not before us.

¶ 28    Next, the plaintiffs claim that the Gaming Board's decision should be reversed because the procedures set forth in section 1800.320 of the Illinois Administrative Code did not afford a hearing or discovery in violation of their procedural due process rights. The plaintiffs contend that they were entitled to discovery and a hearing based upon the "contested case" provisions in section 10-25 of the Illinois Administrative Procedure Act (5 ILCS 100/10-25 (West 2016)).

14

¶ 29   Administrative proceedings are governed by the fundamental principles and requirements of due process of law. See generally *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92 (1992). Due process, however, is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand. *Abrahamson*, 153 Ill. 2d at 92. When reviewing an administrative decision, a court has a duty to examine the procedural methods employed to ensure that a fair and impartial procedure was used. *Abrahamson*, 153 Ill. 2d at 92-93.

¶ 30   Section 10-5 of the Administrative Procedure Act provides, "All agencies shall adopt rules establishing procedures for contested case hearings." 5 ILCS 100/10-5 (West 2016). Section 10-25 provides that in a contested case, "all parties shall be afforded an opportunity for a hearing after reasonable notice." 5 ILCS 100/10-25(a) (West 2016). Under the Administrative Procedure Act, a "contested case" is "an adjudicatory proceeding (not including ratemaking, rulemaking, or quasi-legislative, informational, or similar proceedings) in which the individual legal rights, duties, or privileges of a party *are required by law to be determined by an agency only after an opportunity for a hearing*." (Emphasis added.) 5 ILCS 100/1-30 (West 2016). In order to be entitled to a hearing before an administrative agency under article 10 of the Administrative Procedure Act, there must be some constitutional right, statute, or administrative regulation that requires the agency to conduct a hearing when making the decision at issue. See *Nyhammer v. Basta*, 2022 IL 128354, ¶ 41 (also cases cited within).

¶ 31   Procedural due process protections are triggered only when a constitutionally protected liberty or property interest is at stake. *Nyhammer*, 2022 IL 128354, ¶ 64; *Wilson v. Bishop*, 82 Ill. 2d 364, 368 (1980). The starting point in any procedural due process analysis is " 'a determination of whether one of those protectable interests is present, for if there is not, no process is due.' "

15

*Wilson*, 82 Ill. 2d at 368-69 (quoting *Polyvend, Inc. v. Puckorius*, 77 Ill. 2d 287, 294 (1979)). As noted, there is no common law right to engage in or profit from gambling in Illinois. *J&J Ventures*, 2016 IL 119870, ¶ 26. In this case, the plaintiffs did not raise their procedural due process claim before the Gaming Board. Furthermore, the plaintiffs have made only conclusory assertions about their property interests under the exclusive location agreements and their rights to due process under the United States Constitution and the Illinois Constitution. Stated simply, the plaintiffs did not adequately develop their claim that they have constitutionally protectible interests in the gaming agreements at issue. Accordingly, we decline to address that claim.

¶ 32      In addition, the plaintiffs have not established that a proceeding to decide a petition under Title 11 of section 1800.320 of the Administrative Code constitutes a "contested case" within the meaning of the Administrative Procedure Act. The plaintiffs have not pointed to any provision in the Gaming Act or any other law or regulation that required the Gaming Board to provide an opportunity for discovery or a hearing before the Board decided the merits of their claims.

¶ 33      Section 1800.320 sets forth the procedures governing petitions to determine the validity and enforceability of such agreements. See 11 Ill. Adm. Code 1800.320, amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). Section 1800.320(b)(1) provides that the Gaming Board "shall decide a petition brought by a terminal operator or licensed video gaming location alleging that a Use Agreement, or portion of a Use Agreement, is invalid or unenforceable." 11 Ill. Adm. Code 1800.320(b)(1), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017)). The petition shall be in writing and shall contain "[d]etailed facts and reasons upon which the petitioner relies" in support of the petition. 11 Ill. Adm. Code 1800.320(b)(2)(B), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). The petitioner may include documentary evidence and affidavits. The petitioner bears the

16

burden of proof by clear and convincing evidence. 11 Ill. Adm. Code 1800.320(b)(2), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017).

¶ 34 Upon receipt of a petition meeting the requirements of section 1800.320(b)(2), the administrator is required to promptly send complete copies of the petition to each nonpetitioning terminal operator or licensed video gaming location or other interested party. Nonpetitioning parties are permitted to file written responses, including documentary evidence and affidavits. 11 Ill. Adm. Code 1800.320(b)(3), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). The administrator is then required to issue a written recommended decision and set forth the reasons why "the Administrator is recommending the granting or denial of the petition." 11 Ill. Adm. Code 1800.320(b)(6), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). The petitioner or party named in the petition may file exceptions to the recommended decision. The exceptions "shall specify each finding of fact and conclusion of law to which exception is taken." 11 Ill. Adm. Code 1800.320(b)(7), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). Oral argument on the exceptions is not permitted. 11 Ill. Adm. Code 1800.320(b)(7), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). The Gaming Board then "shall review the entire record, including the petitions filed, the Administrator's recommended decision, and any exceptions filed, and shall render a written order including the bases for its decision." 11 Ill. Adm. Code 1800.320(b)(10)(A), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017).

¶ 35 In this case, the parties complied with the requirements set forth in section 1800.320. The plaintiffs filed their petitions and intervening petitions, along with supporting documentary evidence and affidavits, and Accel filed a response. Following receipt of the administrator's recommended decision, the plaintiffs filed a statement of exceptions. Subsequently, the Gaming Board carefully considered the entire record before issuing a final decision.

17

¶ 36    According to the record, the plaintiffs first asserted a procedural due process claim in their pleadings before the circuit court. There is no indication that the plaintiffs demanded that the Gaming Board provide a hearing or discovery in that proceeding. We note that J&J Ventures' original section 1800.320 petition included a footnote in which J&J Ventures recognized that the existing Gaming Board rules did not provide for a hearing or discovery and "reserved any and all rights to seek and obtain the same." However, J&J Ventures did not make a demand for discovery or a hearing before the Gaming Board, and it did not claim that the Gaming Board's rule violated its rights to due process.

¶ 37    The procedures outlined in section 1800.320 provides a decision-making process based upon the parties' petitions and responses, supporting affidavits and documentary exhibits, and written arguments. By all accounts, those procedures were followed in this case. As noted above, due process requires only such procedural protections as fundamental principles of justice and the particular situation demand. *Abrahamson*, 153 Ill. 2d at 92. After reviewing the record, we find that the plaintiffs failed to show that this matter constituted a "contested case" within the meaning of the Administrative Procedure Act. Furthermore, the plaintiffs failed to show that the Gaming Board's rules deprived them of a fair and impartial process. Accordingly, the plaintiffs have failed to present a meritorious procedural due process claim.

¶ 38    The plaintiffs next claim that the Gaming Board's final order should be reversed because the Gaming Board ignored evidence of fraud and misconduct by Accel and/or its sales agent, Jason Rowell. We disagree. As noted above, the rules established by the Gaming Board require a petitioner to file a written petition containing "[d]etailed facts and reasons upon which the petitioner relies in arguing that a Use Agreement, or portion of a Use Agreement, is invalid or unenforceable." 11 Ill. Adm. Code 1800.320(b)(2)(B), amended at 41 Ill. Reg. 10,300 (eff. July

18

13, 2017). The petitioner may include supporting documentary evidence and affidavits. 11 Ill. Adm. Code 1800.320(b)(2)(B), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). These same standards apply to an intervenor's petition. See 11 Ill. Adm. Code 1800.320(b)(8)(C) (2022). The administrator is then required to issue a written recommended decision, based upon the contents of the petition and any responses. 11 Ill. Adm. Code 1800.320(b)(6)(A), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). Exceptions to the administrator's recommended decision "shall specify each finding of fact and conclusion of law to which an exception is taken." 11 Ill. Adm. Code 1800.320(b)(7), amended at 41 Ill. Reg. 10,300 (eff. July 13, 2017). Notably, section 1800.320 contains no provision that would permit a party to introduce new allegations or new evidence in its exceptions to the administrator's recommended decision.

¶ 39    In this case, J&J Ventures did not allege fraud or misconduct against Accel or its agents in its initial section 1800.320 petition. Likewise, the plaintiff-intervenors, Action Gaming and Illinois Gaming, did not allege fraud or misconduct in their initial pleadings. The plaintiffs first raised allegations of Accel's fraud and misconduct in their exceptions to the administrator's recommended decision. The plaintiffs have not claimed that they were unaware of fraud or misconduct at the time they filed their initial petitions pursuant to section 1800.320, and they have offered no explanation or excuse as to why the allegations of fraud were not presented to the administrator before he issued the recommended decision. Based upon our review of the record, the plaintiffs' allegations of fraud and misconduct were not properly before the Gaming Board. Therefore, the plaintiffs' claim that the Gaming Board ignored evidence of fraud and misconduct is not supported by the record and is without merit.

¶ 40                                III. CONCLUSION

¶ 41    For the reasons stated, the final decision of the Illinois Gaming Board is affirmed.

19

¶ 42    Affirmed.

*J&J Ventures Gaming, LLC v. Illinois Gaming Board*, 2024 IL App (5th) 230255

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Marion County, No. 21-MR-88; the Hon. Mark W. Stedelin, Judge, presiding. |
| **Attorneys for Appellant:** | Christopher A. Koester, Kara J. Wade, and Andrew T. Koester, of Taylor Law Offices, P.C., of Effingham, and William M. Gantz and Keith M. St. Aubin, of Duane Morris LLP, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Chaya M. Citrin, Assistant Attorney General, of counsel), for appellee Illinois Gaming Board.<br><br>Steven P. Blonder, of Much Shelist P.C., of Chicago, for appellee Accel Entertainment Gaming, LLC.<br><br>No brief filed for other appellees. |